**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DUSTIN ZIMMERMAN, GARY SEARER, JUSTIN HERB, RAYMOND SASSAMAN, MATTHEW BURNS, individually and on behalf of all inmates similarly situated, | : : : : : : | CIVIL ACTION NO. 1:06-cv-1893 |
| Plaintiffs, | : : | Judge Sylvia Rambo |
| | : | Filed via ECF |
| v. | : : | CLASS ACTION |
| CRAIG SCHAEFFER, *in his individual capacity*; RONALD BILGER, *in his individual capacity*; CHUCK CHAMBERS, *in his individual capacity*; KATHY WEAVER, *in her individual capacity*; BARRY KEARNS, *in his individual capacity*; BERNIE ZOOK*, in his individual and official capacities*; and MIFFLIN COUNTY, | : : : : : : : : : : : | |
| Defendants | : | |

### *SECOND AMENDED COMPLAINT*

1.　This is a class action seeking to end and remedy the cruel, inhumane, and

degrading conditions now prevailing at the Mifflin County Correctional Facility

("the Facility") in Lewistown, Pennsylvania. Defendants and other correctional

officers at the Facility have been blatantly ignoring the law, including both the United States and Pennsylvania Constitutions, by keeping inmates in restraints for twelve hours or more, using excessive force against inmates, and using Electronic Body Immobilizing Devices (hereinafter "Tasers"), which deliver powerful and debilitating substantial electric shocks.

## *JURISDICTION*

2.      Plaintiffs bring this action under 42 U.S.C. §1983, 28 U.S.C. §§2201, 2202, 2283, and 2284, and Rule 65 of the Federal Rules of Civil Procedure to redress the deprivation, under color of state law, of rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

3.      This Court has jurisdiction under 28 U.S.C. §§1331, 1343, and 1367.

4.      Venue is proper in the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. § 1391(b).

## *PARTIES*

5.      Plaintiff Dustin Zimmerman was an inmate at the Facility on several occasions, including from June 2005 to December 2005 and May 2007 to July 2007. During his incarceration, as described below, he was subjected to unlawful, cruel and inhumane treatment that caused substantial damages. Mr. Zimmerman currently resides in Lewistown, Pennsylvania.

6.    Plaintiff Gary Searer was an inmate at the Facility on several occasions, including from June 2005 to May 2006. During his incarceration, he was subjected to unlawful, cruel and inhumane treatment that caused substantial damages. Mr. Searer currently resides in Lewistown, Pennsylvania.

7.    Plaintiff Justin Herb was an inmate at the Facility on several occasions, including from March 2005 to March 2006. During his incarceration, he was subjected to unlawful, cruel and inhumane treatment that caused substantial damages. Mr. Herb is currently incarcerated at the State Correctional Institution - Forest.

8.    Plaintiff Raymond Sassaman is currently an inmate at the Facility. He has been detained at the Facility on other occasions, including from November 2006 to June 2007. During his incarceration, as described below, he has been subjected to unlawful, cruel and inhumane treatment that has caused substantial damages.

9.    Plaintiff Matthew Burns was an inmate at the Facility on several occasions, including from November 2006 to July 2007. During his incarceration, as described below, he was subjected to unlawful, cruel and inhumane treatment that caused substantial damages. Mr. Burns currently resides in Milroy, Pennsylvania.

10.    Defendant Craig Schaeffer is a corrections officer at the Facility.  He personally participated in mistreating and abusing prisoners, including the representative Plaintiffs.  He is sued in his individual capacity.

11.     Defendant Ronald Bilger is a corrections officer at the Facility.  He personally participated in mistreating and abusing prisoners, including the representative Plaintiffs.  He is sued in his individual capacity.

12.     Defendant Chuck Chambers is a lieutenant at the Facility.  He personally participated in mistreating and abusing prisoners, including the representative Plaintiffs. He is sued in his individual capacity.

13.     Defendant Kathy Weaver is a lieutenant at the Facility. She personally participated in mistreating and abusing prisoners, including the representative Plaintiffs. She is sued in her individual capacity.

14.     Defendant Barry Kearns is a lieutenant at the Facility.  He personally participated in mistreating and abusing prisoners, including the representative Plaintiffs. He is sued in his individual capacity.

15.     Defendant Bernie Zook is the warden of the Facility.  He has personally endorsed and participated in the mistreatment and abuse of prisoners, including the representative Plaintiffs.  Upon information and belief, he continues to endorse and participate in the mistreatment and abuse of prisoners.  He is sued in his individual capacity and in his official capacity.

16.     Defendant Mifflin County is a political subdivision in Pennsylvania.  At all times relevant to the complaint, defendants Bilger, Shaeffer, Chambers, Weaver,

Kearns, and Zook were acting as agents, servants, and/or employees of Defendant Mifflin County.

17.    At all times relevant to the complaint, Defendants were acting and continue to act under color of state law and Defendants Bilger, Shaeffer, Chambers, Weaver, Kearns, and Zook were acting within the scope of their employment.

## *FACTS*

18.    Defendants and other correctional officers at the Facility are engaging in an ongoing pattern and practice of seriously and unlawfully abusing prisoners.

19.    The abuse suffered by the representative Plaintiffs is similar in all material respects to the abuse being suffered by other prisoners, some of whose identities are not yet known.   The abuse suffered by each representative Plaintiff is set forth below.

### *Dustin Zimmerman*

20.    On or about September 11, 2005, Plaintiff Zimmerman and his cellmate Carlos Mendes were unlawfully sprayed with gas or pepper spray, pummeled with batons, and subjected to electric shocks by Tasers.

21.    The persons involved in this unlawful incident included, among others, correctional officers Taylor, Bilger, Shaeffer, Riek, as well as Lt. Chambers and Lt. Kearns.

22.     After Defendants finished pummeling and shocking Zimmerman and his cellmate (who were unarmed), they placed Zimmerman and his cellmate in handcuffs and foot shackles.

23.     Defendants carried Zimmerman to the main booking area and placed him in a restraint chair.  Defendant Bilger put Zimmerman in a choke hold. Defendants Shaeffer, Chambers, and Kearns also restrained him.

24.     As Defendants Bilger, Schaeffer, Chambers, and Kearns were restraining Zimmerman, Taylor shocked him with a Taser.

25.     Taylor was later prosecuted and pled guilty to a charge of official oppression for shocking Zimmerman. Taylor was named in the original complaint in this action, but Zimmerman voluntarily dismissed him from the case after he agreed to cooperate and provide information about illegal practices at the Facility.

26.     Defendants kept Zimmerman bound to the restraint chair for approximately 12 hours.  Defendants refused to permit Zimmerman to use the facilities, instead throwing a diaper at him when he asked to be released to use the facilities.

27.     Defendants refused to allow Zimmerman to clean himself of the burning pepper spray for more than fifteen hours.

28.     As a result of Defendants' abuse, Zimmerman suffered significant pain and a physical injury.  Zimmerman also suffered, and continues to suffer from, mental and emotional harm.

29.    Defendants had no valid penological reason to abuse Zimmerman as they did.  Upon information and belief, Defendants routinely engage in such wrongful abuse.

30.    Upon information and belief, Defendant Zook was aware of the length of time and conditions of Zimmerman's confinement to the restraint chair.

31.    Plaintiffs Herb and Searer also were subjected to a similar pattern of abuse by Defendants.

### Gary Searer

32.    Defendants similarly forced Plaintiff Searer to sleep on a steel bed without padding or pillows for approximately two months.

33.    On at least one occasion prior to November 8, 2005, Defendants kept Searer in restraints for more than 10 hours.

34.    On or about November 8, 2005, Defendants removed Searer from his cell and tied him to a steel bed frame with plastic zip ties with his hands bound above his head. On this occasion, Defendants kept Searer in restraints for more than 50 hours. At some point, Defendants removed Searer from the bed frame and put him in the restraint chair. While he was restrained, Searer was in extreme physical, mental, and emotion pain.

35.    At various times over the course of the approximately 50 hours that he was in restraints, Searer pleaded with Defendants Weaver, Chambers, and Kearns to be

released. They told him that they had no control over when he would be released. They said that it was up to Defendant Zook.

36.     Defendant Zook was aware of and personally responsible for the length of time and manner in which Searer was restrained.

37.     When, after more than 50 hours in restraints, Defendants released Searer and he returned to his cell, he found that Defendants had put a steel plate over the window in the door. Defendants had also removed the electric light in the cell. As a result, the cell was dark at all times of day.

38.     Defendants kept Searer in the cell without light for approximately two months. Defendants denied him showers for as long as thirteen days at a time. Defendants refused to allow Searer to have a mattress, sheets, or pillows. As a result, for at least two months he slept on a steel bed frame.

39.     Defendants also refused to let him send or receive mail. In December 2005, Searer's mother tried to send him information about the legal rights of prisoners and articles about abuses at Pennsylvania's county jails. Defendants rejected these letters and sent them back to her with the notation "contents not allowed."

40.     As a result of Defendants' abuse, Searer suffered severe pain and physical injury. Searer also suffered, and continues to suffer from, mental and emotional harm.

41.     Defendants had no valid penological reason to abuse Searer as they did.

Upon information and belief, Defendants routinely engage in such wrongful abuse.

### *Justin Herb*

42.     In the months preceding November 2005, Defendants put Plaintiff Herb in

restraints for more than 10 hours on multiple occasions. On some occasions,

Defendants put him in a restraint chair. On other occasions, they tied him to a steel

bed frame with plastic zip ties where they left him bound with his hands above his

head for hours.

43.     On one of the occasions when Defendants put Herb in the restraint chair,

Defendants forced him to wear hinge cuffs that were so tight that they caused his

hands to become extremely swollen and painful.

44.     Defendants took away Herb's mattress, and forced him to sleep on a steel

bed without padding or pillows for approximately two months.

45.     On or about November 8, 2005, Defendants removed Herb from his cell and

put him in the restraint chair. On this occasion, Defendants kept Herb in restraints

for more than 50 hours. At some point, Defendants removed Herb from the

restraint chair and tied him to a steel bed frame with plastic zip ties with his hands

bound above his head. When Defendant Chambers bound Herb to the bed frame,

he pulled the zip ties so tight that Herb could not move at all. While he was

restrained, Herb was in extreme physical, mental, and emotion pain.

46.     Defendant Zook was aware of and personally responsible for the length of time and manner in which Herb was restrained.

47.     When, after more than 50 hours in restraints, Defendants released Herb and he returned to his cell, he found that Defendants had put a steel plate over the window in the door. Defendants had also removed the electric light in the cell.

48.     Defendants kept Herb in a darkened cell for approximately two months. Defendants denied him showers for as long as thirteen days at a time. Defendants also refused to let him send or receive mail. Defendants refused to allow him to have a mattress, sheets, or pillows. As a result, for at least two months he slept on a steel bed frame.

49.     After several weeks of living in such conditions, Herb became so despondent that he began banging his head against the wall of his cell.

50.     Defendants removed Herb from the cell and placed him in restraints for approximately 12 hours.

51.     As a result of Defendants' abuse, Herb suffered severe pain and physical injury. While he was restrained, he was unable to sleep. Herb also suffered, and continues to suffer from, mental and emotional harm.

52.     Defendants had no valid penological reason to abuse Herb as they did. Upon information and belief, Defendants routinely engage in such wrongful abuse.

## *Raymond Sassaman*

53.    On approximately March 16, 2007, Raymond Sassaman was ordered to leave his cell and he objected.

54.    After corrections officers sprayed pepper spray into the cell and threatened Sassaman with a Taser gun, he agreed to put on handcuffs and foot shackles.

55.    Corrections officers took Sassaman to cell 106 in the Restricted Housing Unit. When Sassaman was placed in the cell, he was still in handcuffs and his feet were shackled.

56.    Corrections officer Reik entered the cell and jammed Sassaman's face against the cell wall. He then pulled Sassaman out into the hallway and threw him into the restraint chair.

57.    Corrections officers secured the restraint chair's leg and waist straps. Sassaman's hands were handcuffed behind his back and his feet were shackled.

58.    The restraint chair has a depression in it to accommodate hands that are cuffed behind an inmate's back. When Reik threw Sassaman into the chair, his hands were not properly in the depression.

59.    Because his hands were not in the depression, the weight of his upper body was on his arms and hands which caused him severe pain.

60.    Sassaman arched his back to relieve the pressure on his arms and hands and repeatedly told corrections officers that he was not properly in the chair and that he felt as though his arms were breaking.

61.    Reik grabbed Sassaman's neck and pushed his torso down into the chair, causing him severe pain.

62.    While Reik was holding Sassaman by the neck, Defendant Kearns ordered corrections officer Hoskovich to spray Sassaman's face with pepper spray.

63.    Hoskovich refused.

64.    Kearns again ordered Hoskovich to spray Sassaman and again Hoskovich refused.

65.    Kearns ordered Hoskovich a third time to spray Sassaman and, this time, Hoskovich obeyed and sprayed pepper spray on Sassaman's face and in his mouth.

66.    Being sprayed in the face and mouth with pepper spray caused Sassaman extreme physical, mental, and emotional pain and suffering and caused him to lose consciousness.

67.    When Hoskcovich sprayed pepper spray on Sassaman's face and in his mouth, Sassaman's hands were cuffed behind his back, his feet were in shackles, and the leg and chest straps of the restraint chair were secured. He could not have gotten out of the chair.

68.    After Sassaman lost consciousness, corrections officers wheeled the restraint chair into a shower and sprayed water on him at which point he regained consciousness.

69.    When Sassaman regained consciousness, many corrections officers and prison staff members were gathered around him.

70.    Defendant Zook witnessed the entire event.

71.    Corrections officers then wheeled the restraint chair to a cell in the booking area, stopping to adjust Sassaman's hands so that they were properly in the depression.

72.    Shortly after Sassaman arrived at the booking area, Defendant Zook arrived and began to taunt him. Sassaman told him that what had happened to him was not right and that he was going to sue. Zook replied that Sassaman could not afford an attorney.

73.    Sassaman remained in the chair for approximately seven hours.

74.    The depression was filled with water and pepper spray. Sassaman asked that his hands be cuffed in front so that they would not soak in the water and pepper spray. Corrections officers refused his request.

75.    As a result of Defendants' abuse, Sassaman suffered severe pain and physical injury. Sassaman also suffered, and continues to suffer from, mental and emotional harm.

76.    Defendants had no valid penological reason to abuse Sassaman as they did. Upon information and belief, Defendants routinely engage in such wrongful abuse.

### *Matthew Burns*

77.    Over the course of his approximately eight months at the Facility from November 2006 to July 2007, Matthew Burns was constantly harassed and antagonized by corrections officers.

78.    In March or April of 2007, Matthew Burns was in a cell in the booking area waiting to visit the medical department, when corrections officer Benny brought his food tray to the cell door.

79.    Burns had observed Benny take the tray of the cart and take it into another room out of his sight. Fearing that his food had been tampered with, Burns asked for a new tray. Benny refused and Burns did not receive any thing to eat.

80.    Approximately 20 minutes later, Defendant Kearns opened the cell to take Burns to the medical department. Burns asked if Kearns would give him a food tray so he could eat.

81.    Kearns said no and grabbed Burns' arm. Burns told Kearns not to touch him. In response, Kearns grabbed Burns by the neck and shoved him into a corner.

82.    Other corrections officers, including Reik, Thomason, Lewis, and Bollinger, arrived and helped Kearns throw Burns on the ground. They cuffed his hands

behind his back. While Burns was on the ground Kearns and the other corrections officers drove their knees into his back and kicked him.

83.     The officers and Kearns then dragged Burns on the floor from the booking area to his cell in D unit.

84.     They dragged Burns into his cell and slammed his face on the side of the lower bunk, cutting his face.

85.     They then undid Burns' shackles and left the cell. Burns asked for medical care, but his request was denied.

86.     As a result of Defendants' abuse, Burns suffered severe pain and physical injury and humiliation.

87.     Defendants had no valid penological reason to abuse Burns as they did. Upon information and belief, Defendants routinely engage in such wrongful abuse.

88.     Defendants have engaged in a pattern and practice of abusing other inmates.

89.     For example, in November 2004, Defendants removed an inmate named Josh Pennington from his cell and tied him to a steel bed frame with plastic zip ties with his hands bound above his head.

90.     Several corrections officers were in the cell including Taylor, Defendants Schaeffer, Chambers and Zook.

91.     While Pennington was strapped to the bed frame, Taylor struck him in the testicles. Defendant Zook was present when Taylor struck the inmate.

92.     Defendants kept Pennington bound to the bed for at least 10 hours in the same position without interruption. Defendants refused to allow him to use the bathroom.

93.     Defendant Zook was aware of the length of time and conditions of Pennington's restraint on the bed frame.

94.     No valid penological reason existed to keep inmates bound to the bed frame for such a long period of time and in such conditions.

95.     On an unknown date prior to September 2005, Defendant Chambers slapped an inmate he was restraining in the face. Defendant Zook was informed of the incident.

96.     On an unknown date prior to September 2005, Defendant Zook personally participated in the physical abuse of an inmate. While Taylor held the inmate's legs, Defendant Zook jammed his fingers in the inmate's nose and pulled his head back.

97.     Prior to September 2005, Defendant Zook knew or should have known that corrections officers had used and were likely to use excessive force against inmates at Mifflin County Correctional Facility.

98.     Prior to September 2005, Defendant Zook knew or should have known that Taylor was likely to use excessive force against inmates.

99.    Prior to September 2005, Defendant Zook was aware that inmates were being kept in restraints in cruel, inhumane, and degrading conditions for periods of 10 hours or more.

100.   Defendant Mifflin County was aware that inmates at the facility were being abused.

101.   As warden, Defendant Zook is a policy maker for Defendant Mifflin County. Defendant Zook's acts and omissions constitute a policy or practice of encouraging, condoning, tolerating, and failing to prevent abuse of inmates and violations of their constitutional rights.

102.   Upon information and belief, the abusive policies or practices persist to this day.

103.   Defendants Zook and Mifflin County have failed to adequately train and supervise staff at the facility.

104.   Defendants Zook and Mifflin County's actions and inactions have created an environment that encourages corrections officers to employ excessive force and otherwise abuse inmates.

105.   Defendants Zook and Mifflin County were and are deliberately indifferent to the fact that corrections officers have abused inmates at the Facility and violated their constitutional rights.

106.   Defendants Zook and Mifflin County were and are deliberately indifferent to the existence of an environment that tolerates and encourages abuse of inmates and violations of their constitutional rights.

107.   Defendants' acts and omissions constituted reckless indifference to Plaintiffs' constitutional rights.

108.   Plaintiffs seek to represent on claims for equitable relief a class of all present and future prisoners at the Facility who have been harmed or are at risk of harm due to unconstitutional conditions of confinement or other abuse resulting from the practices or policies alleged in this complaint.  The class is so numerous that joinder of their claims is impracticable.

109.   Plaintiffs' claims are typical of the claims of the class members, in that each member of the class has suffered or is at risk of suffering similar harms as a result of the defendants' acts and omissions.

110.   Plaintiffs will be adequate representatives of the class, in that they are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

111.   There are questions of law and fact common to the class, specifically whether Defendants' practices and procedures violate the Eighth and Fourteenth Amendments to the U.S. Constitution.  The policies and practices of the defendants

are the same for all members of the Plaintiff class. All members of the class have

suffered harm or are at risk of harm as a result of the policies and practices.

112.   The questions of fact and law that are common to the members of the class

predominate over any questions affecting any individual members of the class.  A

class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

113.   This action may properly be maintained under Federal Rule of Civil

Procedure 23 (a) and (b).

## COUNT I
### PLAINTIFFS' EIGHTH AMENDMENT EXCESSIVE FORCE CLAIM

114.   Paragraphs 1 through 113 are hereby incorporated by reference as if fully set

forth herein.

115.   Defendants, through their actions, inactions, policies or practices subjected

Plaintiffs or caused Plaintiffs to be subjected to excessive force in violation of their

right under the Eighth and Fourteenth Amendments to the United States

Constitution to be free from cruel and unusual punishments.

## COUNT II

**PLAINTIFFS' EIGHTH AMENDMENT CONDITIONS OF CONFINEMENT CLAIM**

116.   Paragraphs 1 through 113 are hereby incorporated by reference as if fully set forth herein.

117.   Defendants, through their actions, inactions, policies or practices subjected Plaintiffs or caused Plaintiffs to be subjected to conditions of confinement that deprived them of a minimal civilized measure of life's necessities in violation of their right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishments.

## COUNT III

**PLAINTIFFS' STATE LAW INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS CLAIM**

118.   Paragraphs 1 through 113 are hereby incorporated by reference as if fully set forth herein.

119.   Defendants intentionally and willfully inflicted severe emotional distress on Plaintiffs by way of their extreme and outrageous conduct.

120.   Defendants willfull and intentional infliction of emotional distress directly and proximately caused Plaintiffs to suffer physical and mental injuries.

## COUNT IV
### PLAINTIFFS' STATE LAW ASSUALT AND BATTERY CLAIM

121.   Paragraphs 1 through 113 are hereby incorporated by reference as if fully set forth herein.

122.   Defendants willfully and intentionally assaulted, battered, and made other offensive contacts with Plaintiffs.

123.   Defendants willfull and intentional assaults and batteries directly and proximately caused Plaintiffs to suffer physical and mental injuries.

## *RELIEF REQUESTED*

Plaintiffs respectfully pray that this Court grant the following relief:

1.   A declaratory judgment that Defendants' acts, omissions, policies and practices described in this complaint violate the constitutional rights of prisoners at the Facility;

2.   An injunction ordering Defendants to remedy the unconstitutional policies and practices at the Facility;

3.   Compensatory damages against all Defendants, jointly and severally;

4.   Punitive damages to the extent permitted by law;

5.   Reasonable attorney's fees and costs in this suit; and

6.   Any other relief the Court deems appropriate and equitable.

Date:  October 1, 2007                `Respectfully submitted,


s/William T. O'Neil
William T. O'Neil, ID#D.C.426107
(admitted *pro hac vice*)
BURKE O'NEIL LLC
1718 20th Street, N.W.
Washington, D.C. 20009
202.232.5504

Michael J. Cooke, ID# PA91247
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
215.487.6596