IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DUSTIN ZIMMERMAN, *et al.*,                :        Civil No. 1:06-CV-1893
                                           :
                          Plaintiffs       :        JUDGE SYLVIA H. RAMBO
                                           :
              v.                           :
                                           :
CRAIG SCHAEFFER, *et al.*,                 :
                                           :
                          Defendants.      :

# M E M O R A N D U M

Plaintiffs, a number of current and former prisoners at the Mifflin

County Correctional Facility ("MCCF") in Lewistown, Pennsylvania bring suit

pursuant to 42 U.S.C. § 1983 claiming that they were abused by MCCF officials

during their incarceration.  Defendants are Craig Schaeffer, Ronald Bilger, Chuck

Chambers, Kathy Weaver, Barry Kearns, and Bernie Zook—all of whom are

corrections officers and prison officials at MCCF—and Mifflin County,

Pennsylvania.  Before the court are Defendants' motions for summary judgment

against Plaintiffs on all counts.  (Docs. 81, 84, 87, 90.)  Defendant Kearns also seeks

summary judgment against Plaintiff Burns on his counterclaims for assault and

battery.  For the reasons that follow, the motions will be granted in part and denied

in part.

I.        **Background**

          A.        **Facts**

                    Viewed in the light most favorable to Plaintiffs, the facts are as

follows.[1]

---

[1] Many of the facts are disputed by the parties.  Pursuant to the Third Circuit supervisory
(continued...)

## 1.    **MCCF**

Mifflin County Correctional Facility ("MCCF") is a small county jail housing inmates sentenced to limited terms of incarceration. The facility is staffed by thirty-two corrections officers. Defendant Bernie Zook is the warden of the facility.

Defendant Mifflin County hired Zook to be Warden of MCCF in 2003. Zook had previously served as a corrections officer with the Pennsylvania Department of Corrections. He was terminated from that position for using excessive force against a fully restrained inmate, falsely alleging that the inmate was armed with a knife, and directing a subordinate to file a false report about the incident. (Plaintiff's Statement of Material Facts, Ex. 2.) At the time he was promoted to warden, Zook disclosed to Mifflin County the fact that he had been terminated for excessive force, but did not reveal that he had also made false allegations and directed a subordinate to submit a false report. (McCartney Dep. 50, 52–55.) The Mifflin County Commissioners made no further inquiry about the incident before hiring Zook, nor did they interview any of his prior employers. (McCartney Dep. 48–55.)

Once Zook was hired, the County Commissioners and the County Prison Board gave Zook wide latitude in running the prison. Zook was responsible for selecting and hiring correctional officers at the facility. (McCartney Dep. 22–24.) Zook ran the facility as he pleased, and he did not permit dissent or disagreement from his staff. For instance, CO Reik testified at his deposition that when staff disagreed with Zook, "he may say well, that's fine, but it's my way. It's

---

[1](...continued)

rule announced in *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the court will here identify those facts that are subject to genuine dispute. Their materiality is analyzed in the discussion section below.

my jail. That's the way it's going to be." (Reik Dep. 107:22–25.) Likewise, Chambers testified that he did not feel as though Zook would consider a dissenting opinion, noting that when he had disagreed with Zook in the past, Zook's response was "it's his jail and he'll run it the way he wants to." (Chambers Dep. 100:21–24.) Kinslow testified that Zook had strong opinions about how the facility should be run, and "[u]sually if your opinion is different than his, he's usually not very happy about it." (Kinslow Dep. 105:11–13.)

The Mifflin County Commissioners approved the use of force guidelines promulgated by Zook. (Pls. Statement of Material Facts, Ex. 53.) The use of force guidelines define excessive force as "[f]orce than an employee uses against an inmate in which the use of force is justified but goes beyond the force necessary to control the situation or which continues after the inmate complies or is restrained. (Pls. Statement of Material Facts, Ex. 53.) The guidelines prohibit excessive force:

> Even in those situations where all reasonable alternatives to the use of force have been exhausted and the use of force is unavoidable and clearly justified. The amount of force used must not exceed that which is required to control the situation.
>
> 1.  Striking an inmate after he/she has ceased to offer resistance is an excessive use of force.
>
> 2.  Using a mechanical restraint, such as handcuffs and shackles, for an excessive period of time or in an unauthorized manner, such as hogtying, is an excessive use of force.

(*Id*.) With respect to mechanical restraints, the policy provides that such restraints may be used to prevent serious property damage or inmate self-harm, but not as a method of punishment. (*Id.*) Additionally, where such restraints are applied, they may be used "no longer than absolutely necessary under the circumstances" and the inmate must be under continuous observation and periodically examined by medical personnel. (*Id.*)

3

MCCF possesses a number of mechanical restraints. MCCF has a restraint chair, in which an inmate may be immobilized in a sitting position with his hands cuffed behind his back. The manufacturer's literature advises that "[i]n most circumstances, a prisoner should not be retained in the chair for over a four-hour period. If it becomes necessary to restrain the prisoner for a longer period of time, approval from the watch commander should be obtained with the appropriate medical staff review." (Pls. Statement of Material Facts, Ex. 47.) Additionally, the manufacturer advises that soft restraints rather than metal handcuffs should be used where the restraint is longer than one hour, and that a back support should be used where a prisoner is soft-cuffed for more than three hours. (*Id.*)

Warden Zook also created three four-point restraint systems of his own design. He directed the facility's maintenance man to drill holes in the four corners of two metal bed frames. (Kinslow Dep. 24, 28–29; Ramsey Dep. 39–43.) Inmates were restrained in this four point system with plastic flexicuffs attached to metal handcuffs and leg shackles. (Wiseman Decl. ¶ 6.) In his expert report for Plaintiffs, Dr. Mintzes, a former warden of a large Michigan prison, notes that the state of Michigan has never used restraint chairs, and that the existence of such restraints encourages their use. (Pls. Statement of Material Facts, Ex. 59 at 7.)

As will be discussed in greater detail below, restraint chairs were often employed by MCCF staff and Warden Zook for lengthy periods of time against inmates who caused minor property damage to their cell, and even after inmates were subdued. Since 2005, this 125 inmate facility has restrained inmates for more than nineteen hours at a time on more than 19 separate occasions. (Pls. Statement of Material Facts, Ex. 54.) On more than 26 occasions, inmates were restrained more than four hours but less than ten hours. (Pls. Statement of Material Facts, Ex. 55.)

The Commissioners expressly approved Zook's requests to use mechanical restraints on inmates for lengthy periods of time, including the restraint of Plaintiffs Searer and Herb. (McCartney Dep. 70–74.) On other occasions, the Commissioners learned of lengthy restraints of inmates after the fact, but did not oppose the practice or conduct any further inquiry. (McCartney Dep. 74.)

At the time of the events at issue in this litigation, MCCF had in place a prison grievance policy for inmates. (Defs. Statement of Material Facts for Sassaman, Ex. 15.) This policy requires inmates to file a grievance within fifteen days of a grievable event, including complaints of constitutional violations at the MCCF. (*Id.*) According to the policy, a grievance may be either oral or written. (*Id.*) The parties dispute whether Defendants made this grievance policy available to Plaintiffs. The grievance policy was not included in inmate handbooks prior to September 2007 (Pls. Statement of Material Fact, Ex. 43 (inmate handbook lacking section on grievance procedure).) Moreover, as Warden Zook acknowledged in his deposition, dissemination of the policy was haphazard:

> Q.    . . . [D]oes this version of the inmate handbook have a section on grievance procedure?
>
> A.    No. We didn't have it in as part of the inmate handbook before [September 2007]. We had a grievance procedure in effect, but we never put in the handbook. It was in our policies and procedures manual. It had been in there since about, I believe it was 2004 it was put in the policies and procedures manual. And it was posted, like, numerous times throughout in the cell blocks. But every time we would post it, it would eventually get taken down by the other inmates in the block. What they did with it, I don't know. We always had—we didn't have a formal written policy on inmate grievances before that, but we had a box on our request forms. There was a box they could check for inmate complaint or grievance and then they could just write it out on the form and it would be answered, you know, in writing.
>
> Q.    So the inmates didn't have access to the policies and procedures manual, did they?
>
> A.    No. A copy was posted in their cell block.

| Q. | At various times? |
|---|---|
| A. | At various times. |
| Q. | So sometimes it was available and sometimes it wasn't? |
| A. | Yes. |
| Q. | Did there come a time when you stopped posting it completely? |
| A. | I would say not that we stopped, that we would post it, it would come down, and then we would put it back up. It wasn't that we just stopped posting it altogether. It wasn't up on the bulletin board on a continuous basis, but we would periodically re-post it until we put it actually in the handbook, so you know, the formalized procedure that was in the procedures manual. Now it's not necessary to post it because it's in the procedures manual. |

(Zook Dep. 212:2–214:3.) Similarly, in denying a grievance by Plaintiff Sassaman as untimely filed, Zook acknowledged that the grievance policy was not regularly posted: "on several occasions, we have posted the policy on inmate complaints and grievances on the cell block bulletin board so all inmates in the block can read it. However, when we do, they have been removed from the board by inmates. So it is no longer posted." (Pls. Statement of Material Fact, Ex. 60.)

There is also evidence of record that the policy was not understood by the MCCF staff members who were responsible for enforcing it. For example, Schaeffer testified that he was unfamiliar with the grievance policy. (Schaeffer Dep. 54.) Although he testified that he had heard of inmates filing grievances, he did not realize that they could be either oral or written, or that a grievance could be made to any MCCF staff member, himself included. (*Id.*) Defendants point to statements in Plaintiffs' depositions in which they acknowledge knowing that the prison had a grievance procedure, and describing how to file a grievance. (*See, e.g.*, Searer Dep. 43 (stating 2002 inmate handbook he received contained information about grievances); Herb Dep. 63–67 (same).) Nevertheless, based on Zook's description

of the dissemination of the grievance procedure, a reasonable trier of fact could conclude that the policy was not available to MCCF inmates.

### 1.   Dustin Zimmerman

On September 11, 2005, Plaintiff Dustin Zimmerman was extracted from his cell, placed in a restraint chair, electric shocked while fully restrained and compliant, and kept in restraints for a an extended period of time.  The extraction was documented in a video recording, which has been submitted into evidence by the parties.[2]  (Pls. Statement of Material Fact, Zimmerman Cell Extraction Video, Wiseman Decl., Ex. 1; Defs. Statement of Material Facts for Zimmerman, Ex. 18. ) Although the parties also offer numerous deposition transcripts and other documentary evidence describing the events in question, to the extent that this evidence conflicts with the video, the court will rely on the video.  *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (holding that there is no genuine issue of material fact where testimony clearly contradicts video that captured the event in question). Except where noted, the following description of the events of September 11, 2005 is based on the videotape by prison officials submitted by the parties, viewed in the light most favorable to Plaintiffs.

On September 11, 2005, Zimmerman heard a rumor from someone shouting through his window that his brother had been seriously injured in a car wreck and that he needed to contact his family.  (Zimmerman Dep. 107.) Zimmerman later learned that the rumor was false, though he did not realize it at the time.  (Zimmerman Dep. 110.)  Zimmerman asked MCCF officials for permission to contact his family, but they refused his requests to do so on the grounds that inmates in the restricted housing unit ("RHU") were not permitted to use the phones.

---

[2] Each parties submitted different excerpts of the extraction, but there was only one recording of the events in question.

(Zimmerman Dep. 107–109.) Zimmerman and his cell mate Carlos Mendez became angry, and started kicking their cell door and shouting. (Zimmerman Dep. 111–116.) Zimmerman's goal was to convince the staff to let him contact his family. (Zimmerman Dep. 115.)

Corrections officers ordered Zimmerman to stop kicking the door, and when he persisted, they began videotaping his conduct. Defendants have submitted a portion of the videotape, in which Zimmerman and Mendez repeatedly kick their cell door, pace around the cell, and make rude gestures to the officers through the window. (Defs. Statement of Material Facts for Zimmerman, Ex. 18.) Once Zimmerman and Mendez realized that they were about to be extracted from the cell, they gathered sheets and mattresses to resist the officers.

Zimmerman's extraction was led by Weaver. Prior to the extraction, Weaver held briefing session and assigned Reik, Taylor, Kearns, Chambers, Bilger and Schaeffer to various tasks. Weaver assigned Taylor to handle the electronic body immobilizing device ("EBID"). During the briefing session, one officer commented "we don't care if they give up or not, we need to take them down hard." (Taylor Decl. ¶ 2.) The officers understood that regardless of whether Zimmerman and Mendez offered to cuff up and comply, they were going to proceed with the cell extraction. (Reik Dep. 29; Schaeffer Dep. 88.) This contradicted MCCF policy, which requires that force only be used when necessary. (Pls. Statement of Material Facts, Ex. 53.) It also went against Pennsylvania Department of Corrections policy which requires that inmates be given a final chance to cuff up prior to a cell extraction. (Pls. Statement of Material Fact, Ex. 56)

The extraction team approached the cell suited up in masks and other protective gear. Zimmerman can be heard kicking the door and screaming immediately prior to entry. Weaver opened the door and three officers stormed into

the cell, immediately followed by the others.  Within seconds, three officers pinned Zimmerman to the floor face down, and sprayed Zimmerman with oleoresin capsicum spray ("OC spray") a number of times in his face at close range. Zimmerman repeatedly shouted "I'm done" "I'm cuffing up" "I'm down" and "I'm not fighting brother."  Zimmerman did not visibly resist the officers.  Zimmerman also stated "I can't breath" and at one point, he tried to turn over, but was ordered to stay down.  Throughout this time, the corrections officers coughed repeatedly, and several left the cell briefly when they appeared to be overcome by OC spray.

Once handcuffed, Zimmerman was escorted from the cell and placed in the restraint chair in the booking area.  He was handcuffed in the back and held down by three officers, one of whom held his head still while the other two began to cuff his legs to the chair with flex cuffs.  Zimmerman repeatedly said "I'm not going anywhere."  Zimmerman also complained repeatedly about pain in his face and eyes from the OC spray.  Zimmerman was told he would be in the chair for twelve hours, and that he could not clear the OC spray out of his eyes for that time.  At one point, Lt. Weaver walked over, smiling, and flicked water in Zimmerman's eyes.  Her motivation for this action is unclear.  Defendants claim that the purpose for this was to wash the OC spray out of Zimmerman's eyes.  However, Plaintiff's offer testimony from  Kearns that OC spray burns and becomes more painful when small drops of water are placed in one's eyes. (Kearns Dep. 66.)  Weaver's motivation for flicking water in Zimmerman's eyes is genuinely in dispute, and there is sufficient evidence for a reasonable trier of fact to conclude that her purpose in doing so was to inflict pain on Zimmerman.

As Zimmerman was being restrained,  Taylor walked over to the camera operator with the EBID in his hand, and said "[w]hy don't you go down there and check him out."  After the camera turned away, Taylor proceeded to shock

9

Zimmerman with the EBID, despite the fact that Zimmerman was fully restrained in the chair and compliant. Zimmerman immediately screamed that he had been shocked. According to Kinslow, who witnessed Taylor's actions, Taylor responded, "funny, I didn't feel anything." (Kinslow Dep. 70.) Zimmerman remained restrained in the chair for ten hours before he was released. (Pls. Statement of Material Fact, Ex. 10.) At one point, Zimmerman requested to use the bathroom. (Chambers Dep. 45.) Chambers refused to release Zimmerman from the chair, and gave him a diaper to use instead. (*Id.*) Chambers explained that he made this decision because Zimmerman was not compliant but rather yelling and carrying on. (*Id.*) However, this characterization is contradicted by the observation log, which indicates that Zimmerman was talking, but otherwise remained compliant the entire time he was restrained. (Pls. Statement of Material Fact, Ex. 10.) As a result of this incident, Zimmerman has developed post traumatic stress disorder ("PTSD"). (Pls. Statement of Material Fact, Ex. 57.) Although Taylor's use of the EBID was not mentioned during the debriefing session following Zimmerman's extraction from the cell, the officers who witnessed the shock brought it to the attention of Weaver shortly afterwards. (Kinslow Dep. 77.) The officers omitted mention of the incident in their reports describing the extraction filed the same day. (Pls. Statement of Material Fact, Ex. 7.) However, after learning about the incident, Weaver informed Zook and directed the officers to file separate reports documenting the incident. (Weaver Dep. 75; Pls. Statement of Material Facts, Ex. 8.)

Taylor was fired as a result of his conduct against Zimmerman, and criminal charges were brought against him. Taylor was originally named as a defendant to this action, but was later voluntarily dismissed by Plaintiffs. Though Taylor is no longer a Defendant, Plaintiffs maintain that the remaining Defendants are liable for Taylor's conduct on two theories: first, that a number of Defendants at

the scene had the opportunity to prevent Taylor from shocking Zimmerman; and second, that Taylor's lengthy history of misconduct towards inmates at MCCF put Defendants on notice.

The parties dispute whether any other MCCF staff members had prior warning that Taylor was going to shock Zimmerman, or whether anyone could have prevented it. Plaintiffs point to deposition testimony by Kearns, who heard Taylor "test arc" the EBID before applying it to Zimmerman. (Kearns Dep. 93–96.) The only purpose of a test arc is to ensure that the EBID is fully charged and functional. Plaintiff also points out that Taylor had to walk several feet towards Zimmerman before shocking him, (Kinslow Dep. 73) and argue that Kearns or some other supervisor should have stopped him before Taylor administered the shock. However, Defendants respond with evidence that even though a number of officers saw Taylor approach Zimmerman with the EBID, they did not stop him because they did not realize that he intended to apply it to Zimmerman. (*See, e.g.*, Chambers Dep. 34–38.)

Plaintiffs also point to Taylor's extensive record of misconduct towards inmates. Although Taylor was not disciplined by Weaver for misconduct towards female inmates. (Pls. Statement of Material Fact, Ex. 52.) The EBID incident with Zimmerman was the last in a long history of Taylor's mistreatment of inmates and lack of professionalism. From the very beginning, Taylor was known for his poor interpersonal skills and his habit of instigating and escalating conflict with inmates. (Pls. Statement of Material Facts, Ex. 52.) After the incident with Zimmerman, Kinslow remarked that she was surprised at Taylor's conduct, but not shocked. (Kinslow Dep. 68–70.)

For instance, at the conclusion of Taylor's probationary period as a new employee, an evaluator noted that Taylor needed improvement in his

11

communications, commenting that "the content of his oral communication has at times been offensive to staff and inmates." (Pls. Statement of Material Facts, Ex. 52.) During this period, Taylor's interpersonal skills were found to be unsatisfactory. The evaluator commented that "[u]pon consulting with the other shift commanders, Acting Lts. and different department heads I am of the opinion that C.O. Taylor does not always take constructive criticism well and has on numerous occasions been apathetic to the sensitivities of both staff and inmates." (*Id.*) The overall evaluator comment notes that "C.O. Taylor has had several disagreements with both staff and inmates during his probationary period. He needs to be more conscientious of derogatory comments that he has made to both." (*Id.*) On February 2, 2004, Taylor received a written reprimand from Lt. Weaver for arguing with an inmate and enticing him to violence. (*Id.*)

Taylor's Employee Performance Evaluation for 2004 stated that Taylor needed improvement in his interpersonal relations. (*Id.*) The evaluation notes that "C.O. Taylor needs to treat the inmates the way he would want to be treated. At times he has shown a pattern of provoking inmates. He doesn't take criticism well." (*Id.*) In his performance evaluation for the previous year, it was noted that Taylor's interpersonal skills needed improvement. The comments stated that "C.O. Taylor treats staff with respect but he needs to strive better to treat inmates with respect." (*Id.*) In the overall comments for 2003, the evaluator concluded that "C.O. Taylor is a good officer, but he lacks in communicating with the inmates. When he is there to defuse the problem he will create a bigger one just by the words he chooses." (*Id.*)

Taylor had a reputation among his supervisors and fellow corrections officers for having a chip on his shoulder and routinely provoking inmates. (Chambers Dep. 54–57.) Chambers, who once supervised Taylor, testified that Taylor would unnecessarily escalate tensions with inmates over minor matters to the

point where force was required. (Chambers Dep. 54–67.) Likewise, Reik testified that it was well known that Taylor instigated conflicts with inmates. (Reik Dep. 83.)

There is also evidence that Zook personally observed Taylor use excessive force against inmates. For instance, Taylor and Zook both participated in the restraint of an inmate Josh Pennington. During the restraint, which was recorded, as Taylor holds down Pennington, who was restrained, Pennington suddenly cries out that he had been punched in the testicles by Taylor. (Wiseman Decl. ¶ 6.) Defendants dispute this, and Taylor's hands are obscured in the video, nonetheless there is sufficient evidence that a reasonable trier of fact could determine that Taylor did indeed use excessive force against Pennington in the presence of Zook. Taylor was not disciplined for this incident.

Defendants respond that prior to the incident with Zimmerman, Taylor had never had a claim of excessive force filed against him, and point to differences between that incident and those for which he was previously disciplined. (*See, e.g.*, Pls. Statement of Material Fact, Ex. 52 (Taylor disciplined for inappropriate contact with female inmates).) This is a genuine dispute of material fact, and for the purpose of resolving Defendants' summary judgment motion the court concludes that there is sufficient evidence for a trier of fact to conclude that based on Taylor's past misconduct, Defendants knew or should have known that Taylor would apply excessive force to Zimmerman, and could have prevented it.

## 2. Gary Searer and Justin Herb

Plaintiffs Gary Searer and Justin Herb shared a cell at MCCF in the fall and winter of 2005–2006. Beginning on November 8, 2005, both inmates were subjected to lengthy periods of mechanical restraint and confinement to a dark cell without artificial light or mattresses.

There is no dispute that both Searer and Herb had a long history of behavioral problems, and both accumulated numerous prison disciplinary violations and criminal sanctions as a result of violent and destructive behavior against other inmates, prison staff, and prison property in the months leading up to November 2005. (*See, e.g.* Defs. Statement of Material Facts for Searer and Herb, Ex. 13 (disciplinary sanctions against Searer for assault); Ex. 14 (assault charge against Searer); Ex. 16 (Searer disciplined for kicking cell door); Ex. 17 (Searer disciplined for kicking cell door); Ex. 18 (Searer disciplined for threatening inmate and disobeying orders); Ex. 19 (Searer disciplined for failure to follow orders); Ex. 21 (Searer disciplined for damaging cell); Ex. 23 (Searer disciplined for damaging cell); Ex. 24 (Seearer disciplined for kicking cell door); Ex. 25 (Searer and Herb disciplined for kicking cell door); Ex. 28 (Herb disciplined for damaging property); Ex. 29 (Herb disciplined for kicking cell door and yelling); Ex. 30 (Herb disciplined for assaulting another inmate); Ex. 31 (Herb disciplined for kicking cell door and yelling).) As a result of these infractions, Herb and Searer were restrained for more than ten hours on numerous occasions. (Pls. Statement of Material Facts, Exs. 10–12, 14–15.)

Staff at MCCF were aware that both Searer and Herb were mentally ill, and they were eventually diagnosed as bipolar by prison medical staff. (Wawrose Dep. 95–96, 122–23, 135.) The MCCF medical team certified both inmates for involuntary commitment to Warren State Hospital, Pennsylvania's institution for mentally ill criminals. (Pls. Statement of Material Facts, Ex. 23.)

On November 8, 2005, Searer and Herb damaged their cell by breaking the glass window in the door, damaging the overhead light and toilet, and kicking the cell door. (Pls. Statement of Material Facts, Ex. 22.) MCCF sprayed OC spray into the cell, and Searer and Herb ceased their destructive behavior and complied

14

with an order to cuff up.  Thereafter, Searer and Herb were both placed in four-point restraints.  (*Id.*, Ex. 17.)  Zook ordered that they remain in restraints until their cell could be repaired, regardless of their behavior while restrained.  (*Id.*)  The Mifflin County Commissioners were notified by Zook that he intended to restrain Herb and Searer until the cell was replaced, and the extended restraint was approved. (McCartney Dep. 113–14.)

Searer and Herb were each held in restraints for fifty-five hours before they were finally released.  (Pls. Statement of Material Facts, Exs. 18, 21.)  There is no evidence explaining why the decision was made to release Herb and Searer at that time, or whether any staff considered releasing them prior to that point.  At the time they were released, their cell had not yet been repaired.  In any event, the testimony of both medical staff and corrections officers demonstrates that all staff believed that the continued restraint of Herb and Searer had been ordered by Zook, and that no one but Zook had the power to release the inmates from the restraints regardless of whether they were compliant.  (*See* Ingram Dep. 70; Connor Dep. 41, 99; Dawe Dep. 36–37.)  As  Weaver testified in her deposition,

> We were all concerned for their safety, both inmates in there.  But like I said, our hands were tied.  We were given orders to keep them.  We went in, we talked to them.  We tried to, you know, do the best we could for them.  We just were not allowed to untie 'em, except for a couple of times a day.

(Weaver Dep. 265:14–22.)  Weaver further testified that staff were prohibited from bringing Searer and Herb into the light.  (Weaver Dep. 266.)

The parties dispute whether Searer and Herb were compliant in the restraints.  For the most part, the facts indicate that both Searer and Herb remained compliant throughout their restraint.  (Pls. Statement of Material Facts, Ex. 22.) During the restraint period, MCCF kept observation logs indicating the condition of the inmates at fifteen minute intervals.  (*Id.*)  The log indicates that Searer was

crying for the first fifteen hours and the final sixteen hours that he was restrained.
For the remaining time, the log notes that he was talking, and occasionally yelling or
mumbling incoherently. (*Id.*) However, after he had been restrained for twelve
hours, Searer began making threats against Zook and vowed to destroy more
property. (Pls. Statement of Material Facts, Ex. 19.) Both prior to and after these
threats were made, the observation log indicates that Searer was otherwise
compliant. (Pls. Statement of Material Facts, Ex. 22.) Herb was observed crying or
talking for almost the entire fifty-five hour period. (*Id.*)

Upon release from the restraints, Herb and Searer were returned to the
same cell they had damaged, even though it had not yet been repaired. On Zook's
orders, the broken glass in the window was replaced with opaque steel plates. (Pls.
Statement of Material Facts, Ex. 17.) The damaged light on the ceiling was not
repaired, so the only source of light in the cell was a small translucent window at the
top of the back of the cell that let in very little natural light during the day, though
the parties dispute the amount of light. At night, the cell was pitch black. The cell
also lacked mattresses, and Searer and Herb were forced to sleep on the bare steel
beds.       The parties genuinely dispute the degree of light in the cell, and
Defendants submit evidence suggesting that on sunny days, it may have been bright
enough to read. However, there is sufficient evidence of record for a reasonable
trier of fact to conclude that Searer and Herb were deprived of light.

On November 11, 2005, after less than a day in the darkened cell,
Searer and Herb began striking their heads against the walls of the cells, resulting in
cuts and bruises to their foreheads and blood stains on the cell walls. (Pls.
Statement of Material Facts, Exs. 24, 61 (photographs depicting cuts and bruises on
inmates foreheads and blood stains on the cell walls).) Searer and Herb were
removed from the cell, and Searer was placed in the restraint chair, while Herb was

restrained in the four-point restraint for another thirteen hours. (*Id.*, Ex. 24) The observation logs of this restraint indicate that Searer was crying for the entire thirteen hour period. (*Id.*) Herb was observed talking and crying for almost the entire period, and occasionally screaming. (*Id.*)

The MCCF medical staff became increasingly concerned about the treatment and well being of Herb and Searer. On November 11, 2005, Nurse Ingram, who is also a corrections officer at MCCF, spoke with Justin Herb about his self-injurious conduct, and subsequently issued a memorandum to Chambers describing that meeting:

> Inmate Justin Herb asked to speak to me before I left. He started crying and saying he didn't know how much more of this he could take. I asked what he meant and he said being restrained and in the dark cell back on the block. He said that both of them are enough to make you crazy. We talked for a few minutes about why these things were happening to him. He wondered if I could do anything about it, and I explained that I had nothing to do with it. He said throw him in 7 cell in booking and watch him all day he doesn't care but anything is better than what he has been through in the last week. Throughout our entire conversation he continued to cry at regular intervals. He had a hard time looking at me when he was crying. Unsure where this is leading but I am beginning to get concerned for his safety.

(Pls. Statement of Material Fact, Ex. 25.) Five days later, Ingram sent a fax to Suzanne Ward with the following comment: "Suzanne – the latest self-inflicted injury to Searer & Herb. It's way out of control." (Pls. Statement of Material Fact, Ex. 29.) Nurse Miller was also concerned about the inmates' self-injury and made efforts to have them committed to Warren State Hospital. (Miller Dep. 67–72.) Marlin Conner, the mental health counselor for MCCF worried about the effects of sensory deprivation on Herb and Searer due to lack of contact with people. (Conner Dep. 46–48.) Searer complained to MCCF medical staff that he felt pain behind his eyes when they were exposed to light. (Pls. Statement of Material Facts, Ex. 37.)

Searer also reported that he had begun to hallucinate and hear voices. (Wawrose Dep. 105–06.)

During this time, Zook suspended visiting privileges for both Searer and Herb, and issued a memo forbidding corrections staff from distributing aspirin, Tylenol, or writing implements to Searer and Herb. (Pls. Statement of Material Facts, Exs. 20, 28 (Searer denied Tylenol he requested from a corrections officer).) Generally, inmates may obtain pain relievers from corrections officers or medical staff. (Miller Dep. 24.) Zook testified that he denied pain relievers to Searer and Herb because he believed that they may have been receiving too much medication, and that pain relievers were still available to them by prescription from the medical staff. (Zook Dep. 266.) Plaintiffs challenge this explanation, noting that medical staff were unaware of any prior situation in which an inmate had been deprived of access to over the counter pain medication, (*see* Ingram Dep. 103–06), and the fact that Searers' medical records indicate that he received no pain medication from the medical department from November 8, 2005 to November 22, 2005. (Wawrose Dep. 108–115.) Accordingly, there is a genuine dispute of fact as to Zook's motivation for denying pain relievers to Searer and Herb.

Searers' mother attempted to send him a letter telling him about his legal rights, but the letter was returned to her undelivered. (Wyland Decl. ¶ 3.) Defendants dispute this, presenting other evidence suggesting that Searer continued to send and receive mail throughout the period he remained in the darkened cell. (Defs. Statement of Material Facts, Ex. 59 (mail log).) Thus there is also a genuine dispute of fact as to whether Searer was denied legal mail.

After being housed in the darkened cell for twenty-eight days, medical staff persuaded Zook to permit Herb to be housed in another cell in the booking area where he would have access to more light. (Conner Dep. 54.) However, Searer

18

remained in the darkened cell from November 8, 2005 until January 20, 2006, for a total of seventy-one days. On December 6, 2005, Defendant Weaver emailed Zook to inform him of her conversation with Searer:

> He stated he is going back into restraints tomorrow because he gets out into the light. He doesn't care if it's out in booking or the block, as long as there's light. Maybe when you move Herb out of the cell, we could just put Searer in restraints in his dark cell. When he finds out he's not getting light, he might stop.

(Pls. Statement of Material Fact, Ex. 33.) Ultimately the light in Searer's cell was not repaired until January 20, 2006, after the Department of Corrections announced a planned inspection. (Guthridge Decl. ¶ 4.) The maintenance man for MCCF testified that he had the materials available to fix the light in the cell by December 28, 2005, but that he waited another month to do so because the work was not a priority. (Ramsey Dep. 67–83.) Materials were also available to replace the window in the cell door, but the steel plate remained until January. (*Id.*) As a result of their prolonged restraint and conditions of confinement following their release from the restraints, Searer and Herb developed PTSD. (Pls. Statement of Material Facts, Exs. 57 (psychological report for Searer), 58 (psychological report for Herb).) Additionally, Searer suffers from panic attacks and heightened anxiety. (*Id.*, Ex. 57.)

The parties genuinely dispute whether Herb and Searer exhausted their administrative remedies with regard to their claims in this suit. Defendants claim that Herb and Searer failed to file any grievances regarding those claims, and thus that they have failed to exhaust their administrative remedies. However, in his deposition, Herb stated that he filed numerous grievances in November 2005 about cell conditions, issues with mail, and not having a mattress. (Herb Dep. 67–68.) According to Herb, his grievance regarding the mattress was denied, but he received no response to any of his other grievances. (Herb Dep. 68.) Herb also testified at

his deposition that he made an oral grievance to Zook about the restraints while he was still being restrained, but that the grievance was denied. (Herb Dep. 226–27.)

Likewise, Searer testified in his deposition that he submitted numerous grievances regarding the restraint chair, lack of a mattress, the inability to shower, and the conditions of the cell. (Searer Dep. 191–94; Pls. Surreply to Defs. Motion for Summary Judgment, Ex. B (collecting grievances); Pls. Response to Interrogatories, No. 14.) Searer also testified that he received no response to his grievances. (Searer Dep. 194.) During his lengthy stay in the cell, Searer was also denied access to writing materials, which made it difficult for him to submit written grievances. (Searer Dep. 120.) Accordingly, there is a genuine issue of material fact as to whether Plaintiffs Searer and Herb have exhausted their administrative remedies with respect to the events at issue in this litigation.

### 4. **Raymond Sassaman**

Raymond Sassaman was an inmate at MCCF from November 2006 until June 2007. On March 16, 2007, officers at MCCF extracted Sassaman from his cell after he continued kicking his cell door despite numerous orders by prison officials to cease. The cell extraction and restraint was recorded by MCCF officials, and the video was submitted by the parties. (Wiseman Decl. ¶ 5, Ex. 2; Defs. Statement of Material Facts for Sassaman, Ex. 7.) The parties have submitted numerous deposition transcripts and other documentary evidence describing the events in question, but to the extent that this evidence conflicts with the video, the court will rely on the video. *Scott*, 550 U.S. at 378–81.

The cell extraction team first sprayed Sassaman's cell with OC spray. After a few minutes, about five officers entered the cell and Sassaman voluntarily cuffed up. Sassaman's hands were cuffed and his legs were shackled. Sassaman walked with the officers to another cell. The door remained open and Sassaman

calmly stood waiting.  After a few minutes, a corrections officer entered and order Sassaman to face the wall.  He complied.  Two other officers pressed Sassaman's shoulders against the wall.  Sassaman remained calm and put up no resistance.

After another two minutes of calm silence, Sassaman moved one of his shoulders, and  Reik immediately responded by slamming Sassaman's face against the wall and ordering him not to resist.  Sassaman cursed at the officers, protested that he was not resisting, and told  Reik to stop pushing on his head.  Other officers immediately surrounded Sassaman, and he remained immobile, but continued to curse the officers and protest that his face and head was being pressed against the wall.  At this point, other corrections officers outside the cell announced that the restraint chair was prepared, and Sassaman was escorted out of the cell and placed in the chair.

Sassaman offered no resistence as officers cuffed his feet to the chair, though he periodically complained about pain in his wrists and cursed the officers.  After his feet were cuffed, Sassaman was leaned forward into the chair and his handcuffs were adjusted.  As soon as the cuffs were adjusted, Sassaman was pushed down into the chair.  He immediately screamed that his wrists were breaking and arched his back to relieve the pressure on his wrists.  According to Sassaman, his cuffed hands became lodged in a depression at the top of the back of the chair, rather than the bottom of the chair.  (Sassaman Dep. 120–21.)  Rather than check his wrists, the officers forced Sassaman back down into the chair and jerked his head sharply backwards.   Kearns ordered  Hoskavich to spray Sassaman in the face with OC spray.  Hoskavich did not immediately hear the command, and did not spray Sassaman on the first order.  (Hoskavich Dep. 59–67, 82.)  After the command, Sassaman repeatedly shouted "I quit, I quit!" and went limp.   Kearns again ordered

Hoskavich to spray Sassaman, and Hoskavich complied, applying the OC spray directly to Sassaman's face from a very close distance.

After being sprayed in the face, Sassaman began to shake, choke, and gasp, and told officers he could not breath. Officer Reik grabbed Sassaman's head and jerked it backwards repeatedly. Sassaman's body began violently convulsing in a seizure. As Sassaman foamed at the mouth, officers placed a helmet over his head, covering his entire face. His convulsions immediately increased in intensity. Sassaman blacked out, and his dental plate fell from his mouth. One of the officers called a Code Blue, announcing a medical emergency.

As Sassaman continued to choke and convulse, the officers wheeled his restraint chair into the shower and turned on the water. Sassaman remained in the water, fully restrained in the chair, for a number of minutes before he regained consciousness. Sassaman continued to choke, gasp for breath, and shout "I can't breath! Help me!" The officers gathered around him in the shower stall, ordering him to breath and telling him he was okay. After about ten minutes, Sassaman was wheeled to another shower stall and the water was turned on. Sassaman gasped and begged for help and to be let out of the chair. The officers told him to let the water hit his eyes to wash them out. Sassaman begged for a towel to wipe his eyes, and officers held a towel up to his face for him to wipe of the OC spray.

Soaking wet and still fully restrained in the chair, Sassaman was wheeled into a cell on Lt. Weaver's orders and a spit shield was placed over his face. Throughout this time, Sassaman continued to cough and gasp for breath, and he remained fully compliant. Weaver ordered that Sassaman's legs remain restrained in the chair. Altogether, Sassaman remained restrained in the chair for seven hours. (Pls. Statement of Material Fact, Ex. 46.) According to the restraint log, Sassaman remained compliant and did not resist for the duration of his restraint in the chair.

(*Id.*)  As a result of his treatment at MCCF, Sassaman suffers from PTSD, and has developed nightmares and alcohol abuse.  (Pls. Statement of Material Facts, Ex. 58.)

### 5.  Matthew Burns

In the spring of 2007, inmate Matthew Burns was waiting to visit the medical department when  Benny brought a food tray to his cell.  Before passing the food to Burns, Burns observed  Benny take the tray to another room.  (Burns Dep. 61–62.)  Burns feared that his food had been tampered with, and he refused the tray and asked for another tray.  (Burns Dep. 62.)  Benny refused to give Burns another tray.  (*Id.*)  Later,  Benny returned with  Kearns to transfer Burns to another cell.  Burns, who was hand cuffed in front, asked for another tray, and  Kearns refused, stating that Burns had refused his food tray and would not be given another.  (Burns Dep. 62–63.)

The parties dispute what happened next.  According to Burns,  Kearns grabbed Burns by his clothes and shoved him.  (Burns Dep. at 93–94.)  Burns shrugged off Kearns' grasp and told him to keep his hands off of him.  (Burns Dep. at 96–97).  According to  Kearns, Burns became "animated" when the request for another tray was denied, and  Kearns feared that Burns was going to kick over a cart of food trays.  (Kearns Dep. 177.)   At this point,  Kearns testified that he ordered Burns out of the cell, and Burns responded by swinging his handcuffs and striking Kearns.  (*Id.*)  Defendants submitted a photograph depicting bruising on  Kearns' arm, allegedly caused by Burns.  (Defs. Statement of Material Fact for Burns, Ex. 10.)  However, at his deposition, Burns denied striking  Kearns:

Q.    Were you struggling?

A.    Yeah, I was trying to get him off of me when I was in the corner. I pushed him away.

Q.    You pushed him?

A.    And then as soon as the door opened, I fell out.

Q.    You were pushing him back?

A.    No, not pushing him. I couldn't push him; I was handcuffed. But whenever he had me, I was trying to get him off of me, shrugging my shoulders and stuff.

Q.    Did you strike him at all with your hands?

A.    No, I never struck him.

Q.    You didn't push at all with your hands?

A.    No.

Q.    Even though they are handcuffed?

A.    Nope, I ain't that dumb. If I would have hit that man, I'd be upstate.

Q.    So the only thing you tried to do is shrug your shoulders off?

A.    Yeah.

(Burns Dep. 97–98.) Plaintiffs also point out that the incident reports filed concerning the incident do not refer to Burns hitting or injuring Kearns. (Pls. Statement of Material Fact, Ex. 45.) Accordingly, there is a genuine issue of material fact as to whether Burns struck Kearns, and a reasonable trier of fact could find that Burns did not.

As Kearns struggled with Burns, Schaeffer and Tomlinson, Reik, and additional unknown officers arrived to assist him. When the cell door opened, Burns fell on the floor and landed on his face. (Burns Dep. 93.) Burns' cuffed hands were at his stomach, and the officers flipped him over to uncuff his hands and recuff them behind his back, while Burns resisted. (Burns Dep. 99–100.) According to Burns, the officers rubbed his face against the ground and put their knees on his back. (Burns Dep. 101.) An unknown officer kicked Burns on his side as he lay on the ground, leaving a large bruise on his ribs. (Burns Dep. 103.) Zook

arrived.  The parties dispute whether and how  Zook participated in the restraint of

Burns.  Defendants deny that  Zook participated in the restraint of Burns.  (Shaeffer

Dep. 173.)  Plaintiffs submit evidence from another inmate who stated that he

observed  Zook put his foot on Burns' head while eating out of a bowl.  (Guthridge

Decl. ¶¶ 6–8.)  Defendants cite Burns' contradictory evidence at his deposition, at

which he testified that  Zook restrained Burns' head with his hands.  (Burns Dep.

101–102.)  Defendants also urge the court to discount Guthridge's declaration

because he is an inmate.  The court declines to do so.  A reasonable trier of fact

could find, based on Guthridge's declaration and Burns' deposition, that  Zook

participated in restraining Burns.

   The parties also dispute what happened after Burns was subdued.

Burns claims that  Schaeffer and  Tomlinson dragged him down the hallway by his

arms, scraping his face, elbows, and feet against the floor.  (Burns Dep. 104–105.)

Burns was not given an opportunity to walk to the cell.  (Burns Dep. 105.)

According to Burns, once they reached the cell,  Schaeffer threw him against a metal

bed, cutting his forehead.  (Burns Dep. 108–109.)  Defendants deny that  Schaeffer

injured Burns during the cell escort.  According to Burns, who suffers from hepatitis

C, the cut began bleeding profusely, saturating a bath towel.  (Burns Dep. 111–12.)

Both Burns and his cell mate repeatedly requested medical assistance, but Burns

claims that MCCF staff denied their requests.  (*Id.*)  Defendants deny that Burns was

denied medical treatment, pointing to a Report of Inmate Injury filed the same day,

which states that Burns had a bruised temple, a cut on his elbow, and bruising on his

wrists and ankles from the cuffs.  (Defs. Statement of Material Facts for Burns, Ex.

12.)  However, the Report of Inmate Injury states that the injury occurred in the

corridor, not the cell itself, and it does not indicate that any treatment was given for

those injuries, or for the cut on Burns' forehead.  (*Id.*)  After receiving no response

to their pleas for medical attention, Burns' cellmate began kicking the cell door until staff extracted him and placed him in restraints. (Burns Dep. 112; Defs. Statement of Material Facts for Burns, Ex. 11.) Accordingly the parties genuinely dispute Burns' injuries and the care required and given, and a reasonable trier of fact could find that Burns received a serious cut on his forehead and was denied medical treatment for that injury by MCCF.

### 6. <u>Use of Force Against Other MCCF Inmates</u>

There is also evidence of record that Zook was personally involved in the abuse of other inmates at MCCF. For instance, when an inmate named Ebdis Henderson expressed hostility towards the warden, Zook provoked the inmate, saying "[y]ou want some, come get some." (Taylor Decl. ¶ 15–19.) When Henderson lunged at Zook in response, Taylor tackled him to the ground. (Taylor Decl. ¶ 19–20.) With the help of Reik, Henderson was held down and restrained. (Reik Dep. 92–93.) As Henderson was restrained, Zook jammed his fingers into Henderson's nose and yanked his head back, a technique Zook referred to as the "snapdragon." (Taylor Decl. ¶ 21; Reik Dep. 95–100.) The snapdragon is an unauthorized restraint. (Kearns Dep. 109–110.) After the incident, Zook commented "[m]y God, that was fun, let's do it again." (Taylor Decl. ¶ 22; Reik Dep. 98–99.)

On another occasion, Zook participated in the restraint of an inmate named Steven Carstetter, who was being placed in the restraint chair. As other officers struggled to hold down Carstetter, who was resisting, Zook put his knee in Carstetter's groin and applied pressure to force him down into the chair. (Reik Dep. 100–05.)

**B.**         **Procedural History**

On September 26, 2006, Plaintiff Dustin Zimmerman filed a complaint against Defendants. (Doc. 1.) On June 27, 2007, an amended complaint was filed adding as Plaintiffs Gary Searer and Justin Herb. (Doc. 23.) A second amended complaint was filed on February 15, 2008 adding Raymond Sassaman and Matthew Burns as two additional Plaintiffs. (Doc. 59.) Plaintiffs seek compensatory damages, punitive damages, and attorneys' fees on all claims. On July 18, 2008, Defendants filed four separate motions seeking summary judgment against Zimmerman (doc. 81), Sassaman (doc. 84), Burns (doc. 87), and Herb and Searer (doc. 90.) The motions have been fully briefed, and are ripe for disposition.

**II.**         **Standard of Review**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply

27

sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.       Discussion

Because Defendants raise similar arguments in each of their four separate motions, the court will first discuss the common legal arguments in turn, before turning to the separate arguments raised in the motions.

### A.       Personal Involvement of Defendants

Defendants seek summary judgment on claims by a number of individual Plaintiffs against certain individual Defendants, on the grounds that those Defendants were not specifically identified in the second amended complaint. "A defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845

F.2d 1195, 1207 (3d Cir. 1988); *see also Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

Plaintiffs seek leave to amend the complaint to conform to the evidence. Prior to trial, a party may amend a pleading with the written consent of the opposing party or with leave of the court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* With these standards in mind, the court will examine the parties' arguments in turn.

### 1.     **Zimmerman**

Defendants seek summary judgment on Zimmerman's claims against Defendant Weaver on the grounds that the second amended complaint states no personal involvement by Weaver. Plaintiffs seek leave to amend the complaint to state a claim against Weaver, noting that evidence adduced during discovery demonstrates that Weaver was the commanding officer in charge and personally participated in the cell extraction and extended restraint of Zimmerman that is at issue in this suit. Plaintiffs further argue that no prejudice will result from an amendment at this point because Weaver is already named as a defendant to this suit, and there is no danger of unfair surprise because Defendants have had adequate notice of the substance of Zimmerman's claims. In their reply brief, Defendants identify no prejudice that will result from the proposed amendment. Accordingly, Defendants' motion for summary judgment on Zimmerman's claims against Defendant Weaver will be denied, and Plaintiffs shall be permitted to amend the complaint to conform their allegations against Weaver to the evidence adduced during discovery.

### 2.     **Sassaman**

Defendants seek summary judgment on Sassaman's claims against Defendants Schaeffer, Bilger, Chambers, and Weaver for lack of personal

involvement in the events in question.  To the extent that Sassaman makes any claims against  Schaeffer, Bilger, and Chambers, Defendants' motion is granted because there is no evidence that any of these Defendants was personally involved in any deprivation of Sassaman's constitutional rights.

However, the motion will be denied with respect to  Weaver, because there is evidence of record that she was personally involved in the extended restraint of Sassaman.  The video of the incident indicates that Weaver actively participated in the events that form the basis for Sassaman's claims.  The court will permit Plaintiffs to amend the complaint to conform with this evidence.

### 3.    Burns

With respect to Plaintiff Burns, the amended complaint specifically mentions only  Kearns and  Zook.  Defendants seek summary judgment on any claim Burns may have against any other Defendant not specifically named in the second amended complaint.  To the extent that Burns makes any claims against  Weaver, Bilger, and  Chambers, Defendants' motion is granted because there is no evidence that any of these Defendants was personally involved in any abuse of Burns.

However, the motion will be denied with respect to  Schaeffer, because there is evidence of record that he was personally involved in the actions that are the subject of Burns' claims.  Specifically, the second amended complaint alleges that during an escort to his cell, officers slammed Burns' face on the side of the lower bunk, cutting him.  (Second Amended Compl. ¶ 84.)  Both Burns and Schaeffer testified at their depositions that Schaeffer and  Tomlinson, who is not named as a defendant, were the officers who transported Burns to his cell.  Moreover, Burns testified that during the escort, Schaeffer dragged Burns along the corridor and slammed his face into the bunk.  (Burns Dep. 104–12.)  Accordingly, Defendants' motion for summary judgment on Plaintiff Burns' claims against  Schaeffer will be

denied, and Plaintiffs will be permitted to amend the complaint to conform Burns'

claim against Defendant Schaeffer to the evidence adduced on summary judgment.

### B. **Eighth Amendment**

The Eighth Amendment prohibits cruel and unusual punishment, which

includes the unnecessary and wanton infliction of pain by prison officials.  U.S.

Const. amend. VIII; *see also Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981);

*Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The Eighth Amendment both restrains

prison officials from applying excessive force against inmates, *see Hudson v.

McMillian*, 503 U.S. 1, 5 (1992), and it imposes affirmative duties on prison

officials to provide humane conditions of confinement, *see Farmer v. Brennan*, 511

U.S. 825, 832–33 (1994).  Here, Plaintiffs allege that Defendants have violated the

Eighth Amendment both by applying excessive force and by failing to provide

humane conditions of confinement.  These two standards will be set forth in turn.

### 1. **Excessive Force**

The relevant inquiry in evaluating a claim of excessive force by prison

guards is whether the force used was applied in good faith to maintain or restore

discipline, or instead sadistically or maliciously to cause harm.  *Hudson*, 503 U.S. at

6–7.  The latter use of force violates the Eighth Amendment.  *Id.*  In *Whitley*, the

Supreme Court set forth a number of factors that must be considered in evaluating

the use of force by prison officials.  *Whitley*, 475 U.S. at 319.  These include the

extent of any injury to the prisoner, as well as "the need for application of force, the

relationship between that need and the amount of force used, the threat reasonably

perceived by the responsible officials, and any efforts made to temper the severity of

a forceful response."  *Id.*; *see also Hudson*, 503 U.S. at 8 (1992); *Giles v. Kearney*,

571 F.3d 318, 328 (2009); *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

Deference is given to prison officials' adoption of policies to restore order and discipline. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

"Summary judgment in favor of a defendant is not appropriate 'if it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000), *quoting Whitley*, 475 U.S. at 322. Most recently in *Giles v. Kearney*, the Third Circuit reversed a district court grant of summary judgment on a prisoner's claim of excessive force where there was a genuine dispute of fact as to the necessity for the force, and a reasonable trier of fact could have concluded, based on the prisoner's testimony that he had been struck by prison guards even after he had ceased resisting, that the force used was excessive. 571 F.3d at 326–27.

### 2. Conditions of confinement

Conditions of confinement constitute cruel and unusual punishment where those conditions result in a serious deprivation of "the minimal civilized measure of life's necessities" under contemporary standards of decency. *Rhodes*, 452 U.S. at 347. To prevail on a conditions of confinement claim, a plaintiff must show: (1) that the prison conditions pose a substantial risk of harm; and (2) that the prison official was deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Griffin v. Vaughn*, 112 F.3d 703, (3d Cir. 1997); *Tillman v. Lebanon Cty. Correctional Facility*, 221 F.3d 410, 418 (3d Cir. 2000). An officer who is deliberately indifferent must be both aware of the facts from which the inference of a substantial risk of serious harm could be drawn, and the officer must actually draw that inference. *Farmer*, 511 U.S. at 837.

Defendants seek summary judgment on Plaintiffs' Eighth Amendment claims relating to excessive force and conditions of confinement. The court notes

that although Plaintiff's second amended complaint includes separate counts regarding excessive force and conditions of confinement, the factual allegations in the complaint are not organized into separate violations. This is not surprising given that the alleged incidents of abuse by each Plaintiff do not fall into neatly into discrete categories, and many of the incidents alleged in the complaint implicate both Eighth Amendment doctrines. In their motions for summary judgment, Defendants treat each of Plaintiffs' factual allegations separately under each doctrine. However, for certain claims, it is clear that only one doctrine is applicable. Thus, in addressing Defendants' arguments, the court will first loosely organize the claims of each Plaintiff and then analyze those claims under the appropriate Eighth Amendment doctrine. Before turning to the claims of individual Plaintiffs, however, the court will first address an issue common to a number of Plaintiffs—the application of mechanical restraints by Defendants.

### 3. Application of Mechanical Restraints

Plaintiffs Zimmerman, Sassaman, Searer, and Herb all bring Eighth Amendment claims arising out of Defendants' prolonged use of mechanical restraints against them. The parties dispute whether Plaintiffs' claims regarding the use of mechanical restraints fall into the category of conditions of confinement or excessive force, and whether Plaintiffs have proffered sufficient evidence that Plaintiffs' Eighth Amendment rights were violated under either standard.

Case law does not provide a clear answer for which analysis applies. In *Fuentes v. Wagner*, the Third Circuit indicated that the analysis depends on whether a plaintiff's claim encompasses the force initially used to subdue the inmate, or whether the claim is limited to the use of the chair. 206 F.3d 335, 345 (3d Cir. 2000). In *Fuentes*, which involved a claim by a prisoner who had been restrained in a restraint chair for eight hours following a disturbance in his cell, the court did not

decide how the claim should be analyzed, instead finding that the plaintiff's claims failed under either category because he failed to prove deliberate indifference on the part of prison officials. *Id.* In *Camp v. Brennan*, a non-precedential Third Circuit opinion involving a claim by a prisoner who was subdued with a stun gun and detained for two days, the court treated the cell extraction as an excessive force claim and the extended detention as a conditions of confinement claim. 54 F. App'x 78, 80–81 (2002). In both cases, the Third Circuit ultimately found no Eighth Amendment violation, reasoning that the use of mechanical restraints was justified under the circumstances. On the other hand, other circuit courts have analyzed the extended use of mechanical restraints as excessive force, and found that extended application of mechanical restraints constitutes excessive force. *See, e.g.*, *Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996) (applying *Whitley* factors for excessive force to prolonged detention in four point restraint after application of pepper spray).

Shortly after *Fuentes* and *Camp* were decided, the Supreme Court considered the use of mechanical restraints under a conditions of confinement analysis in *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002). The Court concluded a prison's practice of handcuffing an inmate to a hitching post for seven hours presented an obvious Eighth Amendment violation:

> Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because [petitioner] had already been subdued, handcuffed, placed in leg irons, and transported back to the prison. . . Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation.

*Id.* at 738. The Third Circuit has not since considered the constitutionality of mechanical restraints, but to the extent that *Fuentes* and *Camp* conflict with *Hope*, the Supreme Court case is binding authority.

Here, the court finds that Plaintiffs' claims regarding the application of mechanical restraints are most appropriately viewed as excessive force, because the application of the mechanical restraints in each case is closely connected to the use of force in initially subduing Plaintiffs in each incident, and in all cases, a lengthy application of mechanical restraints was authorized in advance. In either case, however, genuine issues of material fact preclude summary judgment on Plaintiffs' Eighth Amendment claims related to the mechanical restraints. Viewing the facts in the light most favorable to Plaintiffs, and applying the *Whitley* factors, a reasonable trier of fact could conclude that the use of mechanical restraints against Plaintiffs by Defendants constituted the wanton infliction of pain in violation of the Eighth Amendment. Each factor will be discussed in turn.

First, the necessity for the use of the restraints in the first instance against each Plaintiff is hotly contested by the parties. Plaintiffs have proffered evidence that restraints were applied in response to relatively minor threats to prison order after MCCF officials had obtained Plaintiffs' compliance. There is also evidence that restraints were routinely used to prevent minor property damage, as in the case of Zimmerman,[3] despite the fact that the use of force policy only authorizes the use of mechanical restraints to prevent serious property damage. (*Id.*)

Second, the parties also dispute the relationship between the need for the mechanical restraints and the amount of force used. MCCF officials kept Plaintiffs in restraints for hours or days at a time, despite the fact that Plaintiffs

---

[3] The parties genuinely dispute whether the alleged property damage caused by Zimmerman for kicking his cell door constitutes "serious" property damage.

remained compliant and posed no further threat to prison order. The prolonged use of mechanical restraints is contrary to MCCF's use of force policy, which prohibits the use of restraints for excessive periods of time, or "longer than absolutely necessary under the circumstances." (Pls. Statement of Material Facts, Ex. 53.) While fully restrained, Zimmerman was also shocked with an EBID, and he was prohibited from using the bathroom, instead forced to use a diaper.

Third, the use of the mechanical restraints resulted in physical and mental injuries to Plaintiffs. Sassaman suffered a seizure and blacked out after he was sprayed with OC spray in the face while restrained. Additionally, both Zimmerman and Sassaman endured their extended restraint while covered with OC spray, which caused a painful burning sensation on their skin. Zimmerman, Sassaman, Searer and Herb all suffer from PTSD and other mental disorders as a result of the use of mechanical restraints against them.

Finally, the parties genuinely dispute the extent of the threat to safety of staff and inmates posed by Plaintiffs, and whether any efforts were made to temper the severity of a forceful response. Plaintiffs have presented evidence that Sassaman, Searer, and Herb voluntarily cuffed up prior to their placement in mechanical restraints, and that Zimmerman ceased resisting MCCF officials shortly after he was subdued in his cell.

In sum, there are multiple genuine issues of material fact regarding MCCF's use of mechanical restraints against Plaintiffs. However, viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could infer that Defendants used mechanical restraints against Plaintiffs maliciously and for the purpose of causing harm, rather than in good faith. Accordingly, Defendants' motions for summary judgment on Plaintiffs' Eighth Amendment claims related to the use of mechanical restraints is denied.

## 4     Plaintiffs' Other Claims

### a.    Zimmerman

Zimmerman's remaining Eighth Amendment claim is related to Defendants' use of force during his cell extraction. Plaintiffs do not appear to argue that the use of force in the initial cell extraction was excessive, but rather argue that Defendants violated the Eighth Amendment by applying OC spray from close range after Zimmerman had been subdued. The parties genuinely dispute whether and when Zimmerman complied with MCCF officials. Based on the video recording of the cell extraction, a reasonable trier of fact could conclude that Zimmerman had been subdued at the time the OC spray was applied, and thus that the of the OC spray was excessive and unjustified. Accordingly, a genuine issue of material fact precludes summary judgment on this claim.

### b.    Searer and Herb

Searer and Herb's remaining claims involve the conditions of their cell after they were released from mechanical restraints. These claims are properly analyzed as conditions of confinement.

The parties genuinely dispute the conditions of Searer and Herb's cell following their release from restraints, and the effect of those conditions on them. Plaintiffs have submitted evidence that after their release from mechanical restraints, Searer and Herb were returned to their damaged cell and deprived of artificial light, mattresses, pain relievers, and visitors for a prolonged period of time—twenty eight days for Herb, and seventy one days for Searer. The parties dispute the level of natural light in the cell, and Zook's motivation for denying pain relievers, but there is sufficient evidence for a reasonable trier of fact to conclude that the cell was quite dark and that pain relievers were denied for no legitimate reason. After a day in the darkened cell, Searer and Herb became despondent and began injuring themselves

until they were restrained again. As Searer and Herb remained in the cell for weeks and months, medical staff became concerned for their safety and mental health due to sensory deprivation. As a result of the conditions of their confinement, Searer and Herb developed PTSD and Searer suffers from panic attacks and anxiety.

Viewing this evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude that both prongs of the *Farmer* test are satisfied: that the cell conditions posed a substantial risk of harm to Searer and Herb; and that Defendants were deliberately indifferent to that risk. Accordingly, Defendants' motions for summary judgment against Searer and Herb on their claims relating to their conditions of confinement will be denied.

### c. <u>Burns</u>

Plaintiff Matthew Burns' claims can be loosely organized into three separate incidents: (1) Burns' initial extraction and restraint from the cell; (2) Burns' transfer to another cell and facial injury; and (3) the denial of medical care for that injury. The first two incidents will be analyzed as claims of excessive force, while the final event will be treated as a condition of confinement.

### i. <u>Cell Extraction and Restraint of Burns</u>

Defendants argue that any force applied against Burns as he was removed from his cell was *de minimus* and applied in a good faith effort to maintain and restore discipline. On the other hand, Plaintiffs describe Burns' initial restraint as a "beating" but offer no evidence to support this characterization. In his deposition, Burns unequivocally stated that he resisted the efforts of Lt. Kearns and other officers to subdue him. Moreover, there is no evidence that the force applied by the officers was more than necessary to restrain and handcuff Burns. Even assuming that an unknown officer kicked Burns in the rib, there is no evidence to suggest that this force was applied deliberately and for the purpose of inflicting pain.

Accordingly, Defendants are granted summary judgment on Burns' Eighth Amendment claims arising out of his initial restraint and extraction from the cell.

### ii. Escort to cell and injury to face

The parties genuinely dispute whether and to what extent force was used and injuries resulted during Burns' transfer to another cell. Plaintiffs offer evidence that after Burns was subdued, Schaeffer and Tomlinson dragged him by his arms to another cell, scraping his face, elbows and feet along the floor, and that when they arrived at the cell, Schaeffer threw him against the bunk, causing a cut to his face and significant bleeding. In response, Defendants argue that Burns received nothing more than superficial scrapes and bruises. There is sufficient evidence for a reasonable trier of fact to conclude that excessive force was applied during Burns escort and placement in the cell. Accordingly, Defendants' motion for summary judgment will be denied with respect to Burns' excessive force claim arising out of his transfer to another cell.

### iii. Denial of Medical Care

The parties genuinely dispute the extent of Burns' injuries and whether he was denied access to treatment for those injuries. Plaintiff has offered evidence that Plaintiff suffered a cut to his face that bled for two hours, enough to saturate a bath towel. Moreover, according to Burns, Defendants denied his repeated requests for medical treatment for the wound. Defendants argue that any injury Burns may have received was superficial, and thus did not rise to the level of a serious medical need. Defendants further argue that medical treatment was provided, pointing to a report of inmate injury. However, based on Burns' description of his injury and his testimony that Defendants failed to respond to his repeated requests for medical treatment in the hours following the injury, a reasonable trier of fact could conclude that Defendants were deliberately indifferent to a serious medical need of Burns.

Accordingly, Defendants' motion for summary judgment on Burns' Eighth Amendment claim arising out of denial of treatment for his injury is denied.

In sum, genuine issues of material fact preclude Defendants' motions for summary judgment in all respects apart from Burns' Eighth Amendment claim for excessive force arising from his initial cell extraction and restraint.

### D. **Qualified Immunity**

Defendants sued in their individual capacities assert that they are entitled to qualified immunity, and seek summary judgment on Plaintiffs' constitutional law claims. Plaintiffs respond that multiple genuine issues of material fact preclude summary judgment on qualified immunity.

Even where a government official has violated the constitution, he may be shielded from liability by qualified immunity if the constitutional right was not clearly established at the time of the violation. "Government officials are immune from suit in their individual capacities unless, 'taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right' and 'the right was clearly established at the time of the objectionable conduct.' " *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).) A right is clearly established if the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202; *Giles*, 571 F.3d at 325. The Supreme Court recently eliminated the rigid two-step "order of battle" required by *Saucier*, and held that courts may exercise discretion in choosing which prong of the qualified immunity analysis to decide first. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Although qualified immunity is generally a question of law and should be considered at the earliest possible stage, a genuine issue of material fact may

preclude summary judgment on qualified immunity. *Giles*, 571 F.3d at 325–26; *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.")

The court has already concluded that Plaintiffs have proffered sufficient evidence of constitutional violations to defeat summary judgment. The only issue is whether those constitutional rights were clearly established at the time the violations occurred. Turning to the second prong of the qualified immunity analysis, the court concludes that the contours of Eighth Amendment case law relating to excessive force and conditions of confinement were sufficiently clear at the time of the events in question that a reasonable officer in the position of individual Defendants would have understood that their conduct violated the Eighth Amendment.

With respect to the use of mechanical restraints, individual Defendants claim that they reasonably believed that their actions were justified based on *Camp v. Brennan*, 54 F. App'x 78 (2002) (non-precedential) and *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000), two Third Circuit cases upholding lengthy restraints of violent and uncooperative prisoners. However, Defendants neglect to cite *Hope v. Pelzer*, in which the Supreme Court held that the prolonged restraint of inmates to a hitching post violated the Eighth Amendment. 536 U.S. 730, 737–38 (2003). *Hope* was decided after *Fuentes* and *Camp*, and before the events that are the subject of the instant litigation. Thus, at the time the alleged constitutional violations occurred, the contours of the Eighth Amendment were sufficiently clear that a reasonable officer in the position of Defendants would have understood that prolonged detention of compliant inmates in a four point restraint violated the Eighth Amendment.

### E.    Supervisory Liability

In order to prevail on a § 1983 claim against a supervisor, a plaintiff must show either that (1) the supervisor directly participated in violating a plaintiff's constitutional rights, (2) that he directed others to do so, or (3) as the officer in charge, the supervisor had knowledge of and acquiesced in constitutional violations committed by subordinates. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001); *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1193–94 (3d Cir. 1995); *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). A plaintiff may also establish supervisory liability by showing that a supervisor tolerated past or ongoing misbehavior by subordinates:

> The plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Brown v. Muhlenerg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001).

Defendants seek summary judgment on Plaintiffs' claims against Defendant Zook premised on supervisory liability. With respect to the claims of Herb and Searer, there is evidence of Zook's personal involvement and direction in the conduct that formed the basis of their constitutional claims. Likewise, Plaintiffs have presented evidence that Zook was present when Burns was dragged down a hallway and thrown in a cell by Schaeffer, and it may be inferred that Zook acquiesced in any resulting constitutional violations. Additionally, there is evidence that Zook was aware of the extended restraint of Zimmerman, and it may be inferred that he was similarly aware of Sassaman's restraint, and acquiesced in it.

Defendants argue that Zook is not liable for the actions of Taylor in shocking Zimmerman with the EBID while Zimmerman was restrained. They argue that Taylor's use of the EBID was unforeseeable, and that after the incident MCCF quickly fired Taylor and initiated criminal charges. In response, Plaintiffs argue that Zook is liable for Taylor's conduct because he was aware of and tolerated the use of excessive force at MCCF. The parties genuinely dispute whether Zook was aware of and condoned the use of excessive force against inmates at MCCF. Plaintiffs point to evidence that Zook maintained great control over the day to day running of the facility. Additionally, Zook was responsible for promulgating a policy relating to the use of force, and training officers in that policy. Plaintiffs also cite evidence that Zook himself used excessive force against inmates in the presence of other officers, including Taylor, and that he was aware of, and acquiesced in the use of such force by other officers at the facility, including Taylor. Based on this evidence, a reasonable trier of fact could conclude that Zook was aware of and condoned excessive force against inmates at MCCF, and that this tolerance resulted in Taylor's application of excessive force against Zimmerman.

Accordingly, Defendants' motions for summary judgment on Plaintiffs' claims against Zook predicated on supervisory liability are denied. For every constitutional violation alleged by Plaintiff, there is evidence that Zook either personally participated in the constitutional violation, that he was present and acquiesced in the violation, or that he was aware of and tolerated the conduct by subordinates that led to the violation.

### F. Monell Liability

Defendant Mifflin County seeks summary judgment on Plaintiffs' claims against it on the grounds that Plaintiffs have produced no evidence of any

policy or practice of Mifflin County resulting in any constitutional violations by the municipality.

Municipalities are only liable for constitutional violations pursuant to 42 U.S.C. § 1983 where the violation is caused by an official policy of that municipality and its policymakers acted with deliberate indifference. *Monell v. Dep't of Social Serv. of the City of N.Y.*, 436 U.S. 658, 690–95 (1978). In order to prevail, Plaintiffs must show that a policy maker for Mifflin County authorized policies that let to the violations, or permitted practices that were so permanent and well settled as to establish acquiescence. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1191 (3d Cir. 1995); *see also Simmons v. City of Phila.*, 947 F.2d 1042, 1064 (3d Cir. 1991), *cert. denied*, 503 U.S. 985 (1992).

Here, in their second amended complaint Plaintiffs assert that Zook is a policy maker for Mifflin County, and that he has established "a policy or practice of encouraging, condoning, tolerating, and failing to prevent abuse of inmates and violations of their constitutional rights" and that the policies persist to this day. (Second Amended Complaint ¶¶ 101–102.) The complaint further alleges that Zook and Mifflin County failed to adequately train and supervise staff (*id.* ¶ 103), and that Zook and Mifflin County "have created an environment that encourages corrections officers to employ excessive force and otherwise abuse inmates." (*Id.* ¶ 104.)

The parties do not dispute that Warden Zook is a policy maker for Mifflin County. Additionally, as noted above, Plaintiffs have proffered sufficient evidence that a reasonable trier of fact could conclude that Zook established a well settled custom of using excessive force against inmates in violation of MCCF's official use of force policy. Moreover, Mifflin County Commissioners were aware of Zook's past record of inmate abuse, and that MCCF staff held inmates in mechanical restraints for lengthy periods of time on numerous occasions and also

44

had a policy or practice of failing to provide oversight or inquiry into these practices. Under these circumstances, a reasonable trier of fact could find that Mifflin County is liable for violating Plaintiffs' Eighth Amendment rights. Accordingly, Defendants' motions for summary judgment on Plaintiffs' claims against Mifflin County are denied.

### G.    Claims Against Zook in his Official Capacity

Defendant Zook seeks summary judgment on Plaintiffs' claims against him in his official capacity on the grounds that they duplicate the claims against Mifflin County. While that may be true, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985), Defendants do not explain why that would entitle them to summary judgment on the claims against Zook in his official capacity. Unlike the government entities in the cases cited by Defendants, Mifflin County is not immune from Plaintiffs' claims. Accordingly, Defendants' motions for summary judgment on Plaintiffs' claims against Zook in his official capacity are denied.

### H.    Punitive Damages

Defendants Zook and Mifflin County seek summary judgment against Plaintiffs on their claims for punitive damages. It is well established that punitive damages cannot be recovered against municipalities or individual employees acting in their official capacities. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–60 (1981); *see also Coleman v. Kaye*, 87 F.3d 1491, 1506 (3d Cir. 1996). Accordingly, Defendants Zook and Mifflin County are entitled to summary judgment on Plaintiffs' claims for punitive damages from Zook in his official capacity, and Mifflin County, a municipality.

### I.    Assault and Battery

Defendants seek summary judgment on all of Plaintiffs' state law claims for assault and battery on the grounds that the contact was privileged under state law, and for Defendant Kearns' counterclaim of assault and battery against Matthew Burns. Under Pennsylvania law, an assault occurs when one acts with the intent to place another in reasonable and immediate apprehension of harmful or offensive contact, and that act does cause such apprehension. Restatement (Second) of Torts § 21 (1977); *see also Sides v. Cleland*, 648 A.2d 793, 796 (Pa. Super. Ct. 1994). A battery is an intentional offensive bodily contact. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1990). Defendants' arguments will be addressed in turn.

### 1.     Plaintiffs' Assault and Battery Claims

Defendants do not deny that Plaintiffs have satisfied the elements of their state law claims for assault and battery. Instead, Defendants argue that they are entitled to summary judgment on these claims because any contact with Plaintiffs was privileged under state law.[4] However, rather than privileging use of force by correctional officers, Pennsylvania administrative regulations governing the conduct of correctional officers provide that "[a] staff member *may not use any greater force against an inmate than is necessary* to protect the staff member or others from bodily harm or to protect property from damage or destruction or to prevent a criminal act or to effect compliance with rules when other methods of control are ineffective." 37 Pa. Code § 91.6 (emphasis added).

---

[4] Defendants claim that their actions were privileged pursuant to 95 Pa. Code § 241(a)(5)(ii). This is an invalid citation, and it appears that Defendants may have been referring to 37 Pa. Code 95.241, which addresses security requirements for Pennsylvania county jails. However, that provision does not justify or privilege the use of force against inmates, but rather restricts the use of force to "justifiable self-defense, protection of others, protection of property, prevention of escapes. . . and only the least amount of force necessary to achieve that purpose is authorized." 37 Pa. Code § 95.241(2)(i).

As noted above, the necessity of the force used by Defendants against Plaintiffs is genuinely in dispute. Because there is sufficient evidence for a reasonable trier of fact to determine that the force applied by Defendants was more than necessary, Defendants' motions for summary judgment on Plaintiffs' assault and battery claims will be denied.

### 2. Defendant Kearns' Counterclaim Against Burns

Defendant Kearns seeks summary judgment on his counterclaim for assault and battery asserted against Burns. Kearns claims that the evidence establishes that Burns committed assault and battery by resisting Kearns' attempts to restrain him. However, the parties genuinely dispute whether Burns struck Kearns, and there is sufficient evidence for a reasonable trier of fact to determine that Burns did not intentionally subject Kearns to a harmful or offensive bodily contact, or place him in reasonable apprehension of such contact. Accordingly, the court will deny Kearns' motion for summary judgment on his counterclaim for assault and battery against Burns.

### J. Intentional Infliction of Emotional Distress

Defendants seek summary judgment on Plaintiffs' state law claims for intentional infliction of emotional distress ("IIED") on the grounds that IIED is not recognized as a cause of action in Pennsylvania. However, the cases cited by Defendants do not support their argument that they are entitled to summary judgment. Although Pennsylvania Supreme Court has not yet recognized a claim for IIED, *see Taylor v. Albert Einstein Medical Ctr.*, 754 A.2d 650, 652 (Pa. 2002), the Third Circuit Court of Appeals and federal district courts in Pennsylvania have repeatedly predicted that Pennsylvania will recognize such a claim in the future, and have declined to dismiss IIED claims. *See, e.g.*, *Pavlik v. Lane Limited/Tobacco*

47

*Exporters Int'l*, 135 F.3d 876, 890 (3d Cir. 1998); *Nudleman v. Borough of Dickson City*, No. 05-1362, 2007 WL 3275259, *7 (M.D. Pa. 2007).

Defendants further argue that even if such a cause of action is recognized, Plaintiffs cannot satisfy the elements of a claim for IIED, which requires extreme and outrageous conduct that was either reckless or intentional, and which results in severe emotional distress and injury to the plaintiff. Restatement (Second) of Torts § 46 (1977). Defendants argue that Plaintiffs will be unable to prevail in their claims because (1) Defendants' conduct did not rise to the level of extreme and outrageous, and (2) Plaintiffs have no competent medical evidence establishing severe emotional injury. These arguments will be addressed in turn.

First, Plaintiffs have presented sufficient evidence that a reasonable trier of fact could find that Defendants' conduct towards Plaintiffs was extreme and outrageous. Though the parties vigorously dispute the facts, there is evidence that Defendants used excessive force against Plaintiffs and subjected them to unconstitutional conditions of confinement. Moreover, the evidence is sufficient for a reasonable trier of fact to find that Defendants' conduct was "so extreme and outrageous as to go beyond all possible bounds of decency, to be regarded as atrocious and utterly intolerable in a civilized community." *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987).

Second, Plaintiffs Zimmerman, Searer, Sassaman, and Herb have proffered competent evidence to establish severe emotional injury as a result of Defendants' conduct. Plaintiffs have presented an expert report by Dr. Kathleen Young who examined Plaintiffs Zimmerman and Searer, and found that they both suffer from PTSD, and that Searer additionally suffered from panic attacks and heightened anxiety as a result of their treatment at MCCF. (Pls. Statement of Material Fact, Ex. 57.) Plaintiffs also submitted an expert report by Dr. Ankur

Saraiya, who examined Raymond Sassaman and Justin Herb. (*Id.*, Ex. 58.) Dr. Saraiya found that as a result of his treatment at MCCF, Sassaman suffers from PTSD, and has developed nightmares and alcohol abuse. (*Id.*) Dr. Saraiya diagnosed Herb as suffering from an anxiety disorder as a result of his treatment at MCCF. (*Id.*) Accordingly, Plaintiffs Zimmerman, Sassaman, Herb, and Searer have adduced competent medical evidence of severe emotional injury, and Defendants are not entitled to summary judgment on their IIED claims.

However, Defendants are entitled to summary judgment on Burns' claim for IIED because there is no competent medical evidence that Burns has suffered severe emotional distress. The Supreme Court of Pennsylvania has held that in order to satisfy the injury element of an IIED claim, a plaintiff must present competent medical evidence that he has actually suffered from severe emotional distress. *Kazatsky*, 527 A.2d at 197–98. Here, unlike the other Plaintiffs, Burns' only evidence of severe emotional distress is his own testimony. (Pls. Brief in Opp. to Defs. Motion for Summary Judgment against Burns at 14.) Because this evidence is insufficient to satisfy the element of injury, Defendants are entitled to summary judgment on Burns' state law IIED claim.

## K.   Failure to Exhaust Administrative Remedies

Defendants seek summary judgment against Plaintiffs Herb, Sassaman, and Searer on the grounds that they failed to exhaust their administrative remedies. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Proper exhaustion requires compliance with an agency's deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006). However,

exhaustion is not required where grievance procedures are not made available to an inmate. *See Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003) (holding that administrative remedies are not "available" where prison officials deny the inmate the necessary grievance forms).

A plaintiff is a "prisoner" under the PLRA if he was a prisoner confined in a correctional facility on the date the complaint was filed. *Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir. 2002). Accordingly, litigants who file lawsuits challenging prison conditions after their release from incarceration are not subject to the PLRA's exhaustion requirement. *Id.*; *see also Grieg v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999); *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998); *Janes v. Hernandez*, 215 F.3d 541, 543 (5th Cir. 2000); *Doe v. Washington Cty.*, 150 F.3d 920, 924 (8th Cir. 1998). However, the PLRA exhaustion requirements apply if a prisoner is incarcerated at one facility when his claim accrues, but is subsequently incarcerated at a different facility when he files his claim. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2003); *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 35 (1st Cir. 2002).

The parties dispute whether the PLRA applies to Herb, Sassaman, Searer, and if so, whether they have exhausted their administrative remedies. Defendants' arguments will be addressed in turn.

## 1. <u>Herb</u>

Defendants argue that they are entitled to summary judgment against Herb because he failed to properly exhaust his administrative remedies. Herb, who was incarcerated at SCI Forest when he filed this lawsuit, does not dispute that he was a prisoner at the time this action was filed, and thus that the PLRA exhaustion requirement applies to him. Instead, Herb argues that he has satisfied the exhaustion requirement, or alternatively, that his failure to do so is excused because the

exhaustion procedure was not available to him. As noted above, genuine issues of material fact preclude summary judgment on Defendants' affirmative defense of failure to exhaust administrative remedies. A reasonable trier of fact could conclude that the administrative remedy procedure was not available to Herb, or that Herb has in fact exhausted his administrative remedies by filing grievances on his claims.

### 2. **Sassaman**

Plaintiff Sassaman joined the instant litigation with the filing of the second amended complaint on February 15, 2008. (Doc. 59.) He had been released from MCCF on February 7, 2008. (Pls. Statement of Material Facts, Ex. 48.) Thus, at the time he joined the lawsuit, Sassaman was no longer a prisoner subject to the PLRA. Defendants argue that the exhaustion requirement should apply because Sassaman was still a prisoner on October 3, 2007, when Plaintiffs filed a motion for leave to file a second amended complaint naming Sassaman as an additional Plaintiff. (*See* Doc. 44.) The court rejects Defendants' contention the relevant date is the date Plaintiffs sought leave to file an amended complaint adding Sassaman as a party. Sassaman did not become a party until the second amended complaint was actually filed, on February 15, 2008. Accordingly, because Sassaman was not a prisoner at the time he filed suit, he is not subject to the exhaustion requirement of the PLRA.

### 3. **Searer**

In their reply brief to their motion for summary judgment against Plaintiffs Searer and Herb, Defendants argue for the first time that Searer's claims are barred by the PLRA for failure to exhaust administrative remedies. However, as noted above, genuine issues of material fact preclude summary judgment on Defendants' affirmative defense of failure to exhaust administrative remedies. A reasonable trier of fact could conclude that the administrative remedy procedure was

not available to Searer, or that Searer has in fact exhausted his administrative remedies by filing grievances on his claims.

**IV.**     **Conclusion**

For the reasons stated above, Defendants' motions for summary judgment will be granted in part and denied in part.  Defendants are entitled to summary judgment on Sassaman's claims against Defendants Schaeffer, Bilger, and Chambers and Burns' claims against Weaver, Bilger, and Chambers.  Defendants are also entitled to summary judgment on Burns' claim of excessive force arising out of his initial cell extraction and restraint, Burns' state law claim for IIED, and on Plaintiffs' claims for punitive damages against Mifflin County and Defendant Zook in his official capacity.  Consistent with this memorandum, Plaintiffs will be granted leave to file an amended complaint to conform to the evidence adduced during discovery as to the allegations by Plaintiff's Zimmerman and Sassaman against Defendant Weaver.  In all other respects, Defendants' motions will be denied.  An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  August 17, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DUSTIN ZIMMERMAN**, *et al.*, | : | Civil No. 1:06-CV-1893 |
| **Plaintiffs** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **CRAIG SCHAEFFER**, *et al.*, | : | |
| **Defendants.** | : | |

# O R D E R

In accordance with the foregoing memorandum of law, **IT IS HEREBY
ORDERED THAT**:

(1)   Defendants' motions for summary judgment are granted in part
and denied as follows:

(a)   Defendants' motions are **GRANTED** with respect to
Sassaman's claims against Defendants Schaeffer, Bilger, and Chambers
and Burns' claims against Weaver, Bilger, and Chambers

(b)   Defendants' motions for summary judgment (Docs. 81, 84,
87, and 90) are **GRANTED** with respect to Plaintiffs' claims for
punitive damages against Defendant Mifflin County and Defendant
Zook in his official capacity;

(c)   Defendants' motion for summary judgment against Burns
(Doc. 87) is **GRANTED** with respect to Burns' claim of excessive force
arising out of his initial cell extraction and restraint;

(d)   Defendants' motion for summary judgment against Burns
on his state law IIED claim is **GRANTED**;

(e)     Plaintiffs are granted leave to file an amended complaint to conform to the evidence adduced during discovery as to the allegations by Plaintiff's Zimmerman and Sassaman against Defendant Weaver

(f)     In all other respects, Defendants' motions (Docs. 81, 84, 87, and 90) are **DENIED**.

(2)     The Clerk of Court shall defer the entry of the grant of summary judgment listed above until the conclusion of the case.

3)     A new case management order will issue by separate order.


s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  August 17, 2009.